**UNITED STATES of America, Plaintiff–Appellant,**

v.

**Cyrus Jonathan GEORGE, Defendant–Appellee.**

No. 91–5669.

United States Court of Appeals, Fourth Circuit.

Argued May 8, 1992.

Decided July 23, 1992.

As Amended Aug. 12, 1992.

Karen Ingrid Skrivseth, U.S. Dept. of Justice, Washington, D.C., argued (William A. Kolibash, U.S. Atty., David E. Godwin, Lisa A. Grimes, Asst. U.S. Attys., Wheeling, W.Va., on brief), for plaintiff-appellant.

Brent E. Beveridge, Fairmont, W.Va., argued, for defendant-appellee.

Before RUSSELL and LUTTIG, Circuit Judges, and MICHAEL, United States District Judge for the Western District of Virginia, sitting by designation.

OPINION

LUTTIG, Circuit Judge:

The United States District Court for the Northern District of West Virginia suppressed evidence critical to the racketeering prosecution of defendant-appellee Cyrus Jonathan George. We reverse in part, vacate in part, and remand.

I.

Dallas P. Rice was shot near his secluded trailer home in Ten Mile, Upshur County, West Virginia, shortly after 5 p.m. on November 14, 1986. *See* App. at 205–09. Rice's trailer home was accessible by two roads—a main dirt road and Calico Road, a one-lane dirt road that could be traversed only by four-wheel drive vehicles. Upon arrival at the scene of the shooting, county police, including sheriff Fred Gaudet and deputy Lewis Anderson, determined that the shots had been fired from an area of freshly cut brush atop a cliff approximately 100 yards behind the clearing where Rice had been standing when he was shot. *See id.* at 222. The police also concluded that Calico Road had not been recently traveled and that the main road to Rice's trailer home had been traveled only by Rice's neighbors. *See id.* at 221.

When Gaudet and a county officer drove up Calico Road approximately 1–1½ hours later, they broke through the ice that was covering numerous mudholes due to the recent freeze. Officers dispatched to block off the other end of Calico Road also found iced-over mudholes, confirming that no vehicle had recently exited the area via the road. *See id.* at 254–56. After driving a quarter mile on Calico Road, Gaudet discovered an area near the road where a vehicle had been parked. *See id.* at 255–56. Police with bloodhounds had followed a different quarter-mile trail to this same location from the site of the shooting. *See id.* at 239, 269. As Gaudet drove beyond this spot, he discovered that a vehicle driving in the same direction had already broken through the ice covering the mudholes in the road. *See id.* at 256. Proceeding along the road, Gaudet encountered defen-

dant-appellee Cyrus Jonathan George driving toward him in a four-wheel drive truck. *See id.* at 256–57. George was stopped by the police, and before they could interrogate him, George spontaneously said, "I don't have any guns. Go ahead and search my truck, I give you my permission," and "I didn't hear any shots." *Id.* at 258, 259; *see also id.* at 276. (George claimed to be tracking a bear. *See id.* at 260.) George also admitted to the police that he had been "parked ... earlier looking at the river." *Id.* Gaudet searched George's truck and found a tool box, but no gun. *See id.* at 262–63. The police did not arrest George. *See id.* at 264.

George agreed to take polygraph and paraffin tests, *see id.* at 260–61, 276, and Gaudet asked him to drive back to the other end of Calico Road, *see id.* at 243. When George arrived at the end of Calico Road, however, he told the officer who met him that he would not take the tests. *See id.* at 261, 265. The police thereafter took photographs of George and his truck. *See id.* at 264. These photographs showed that George's knees and the back of his pants were damp and that he was wearing boots. *See id.* at 277. The police also photographed tire tracks near the crime scene. *See id.* at 270.

As the investigation of the Rice shooting continued in the days following, the police found assorted evidence in and around the Calico Road area. They recovered a cardboard box labeled "Remington Shells," some .30/30 shells, and parts of a gun that had been sawed into small pieces. Near where George had parked his truck, police recovered the receiver of a Winchester Model 94 .30/30 lever-action rifle. *See id.* at 228–29, 234–35, 241, 279. A trace of the serial number found on the receiver disclosed that the gun had been purchased by George on August 10, 1973. *See id.* at 233–34. The police also recovered half a

hacksaw blade from the river, metal shavings, cloth fragments, paper towels, and scraps of black electrician's tape. *See id.* at 228–31, 238–39, 242.[1]

On February 3, 1987, someone shot at Sheriff Gaudet. The bullet missed Gaudet and lodged in his car. *See id.* at 119–20. (George knew at this time that he was under investigation for the Rice shooting. *See id.* at 114.) The next day, after a meeting with the state prosecutor, county police decided to obtain arrest and search warrants for George in connection with the Rice shooting. *See id.* at 106–07. Testimony revealed that the police had felt an "urgency" to procure the search warrants following the Gaudet shooting because they had feared that the Rice and Gaudet shootings might be "signature crimes," given the similarities between the two incidents. *Id.* at 114; *see also id.* at 106.[2]

Deputy Anderson swore out two affidavits, one in support of a search warrant for George's residence and one in support of a search warrant for George's truck. The affidavit supporting the search warrant for the residence recited as follows:

> George was found and located in the immediate vicinity at or near the time ... Dallas P. Rice was shot and is a suspect in the shooting. The affiant has also personally observed rifles in said residence, and the said Cyrus J. George has been observed test firing high powered rifles within close proximity to the above described residence.

*Id.* at 200. This affidavit sought authorization to search for "any and all high powered rifles, cartridges, bullets, components, cartridge cases [or] boxes, expended bullets, other firearms, ammunition, reloading components and equipment, hacksaws, clothing and footwear." *Id.*

---

1. According to an FBI report, bullets recovered from the shooting scene were consistent with those fired from a .30/30 Winchester rifle. *See id.* at 268. The report apparently also concluded that the gun parts recovered from the river had been placed in the river at approximately the time of the Rice shooting. *See id.* at 267.

2. Both incidents occurred at dusk, and each time, a gunman fired a rifle from a position concealed by heavy vegetation. *See id.* at 108–10. In each instance, the gunman parked his vehicle a quarter mile away and then walked to the "blind" from which shots were taken. *See id.* at 108–09.

The affidavit submitted in support of the search warrant for George's truck sought authorization to search for the same items, plus "tires located on the . . . truck." This affidavit read in relevant part:

George was found in the immediate area at or near the time of [the Rice] shooting in the above mentioned vehicle; affiant has knowledge that the said Cyrus J. George has carried the above items in said truck; the affiant is of the belief that the above vehicle was used in the commission of said offense and was being operated by the said Cyrus J. George at the time of said offense.

*Id.* at 195.

Deputy Anderson also swore out a complaint in support of a warrant for George's arrest. *See id.* at 125–26. Although this complaint is not in the record, the government represents that the complaint stated as follows:

Cyrus J. George was found in the immediate vicinity of the location where . . . Dallas P. Rice was shot at the time of the shooting; . . . pieces of a rifle belonging to Cyrus J. George were found in the immediate area of said shooting, and . . . no other person or person(s) were found in [the] area.

Appellant's Br. at 10 n. 8.

A county magistrate issued the three requested warrants on February 5, 1987, and George was arrested that day while in his truck. His truck was impounded, *see* App. at 159, and tires and three hacksaw blades, among other items, were seized from the vehicle, *see id.* at 193. Three pairs of boots and various other items were seized from George's residence. *See id.* at 198. Only the tires, hacksaw blades, and boots seized pursuant to the warrants are at issue in this appeal.

On April 16, 1990, George was indicted in the United States District Court for the Northern District of West Virginia on a variety of racketeering counts, including two counts of conspiring to commit murder in aid of racketeering, one count of maiming in aid of racketeering, and one count of attempted murder in aid of racketeering. *See generally id.* at 8–70. George filed two suppression motions relating to the evidence seized pursuant to the search warrants for the truck and the residence. *See id.* at 71–81. After an evidentiary hearing on these motions, a federal magistrate issued proposed findings of fact and recommended that the court grant the motions. *See id.* at 133–45.

The federal magistrate concluded that both warrants were invalid because the affidavits presented to the county magistrate were "too scanty and too far removed in time to support a finding of 'present' probable cause." *Id.* at 139. The magistrate rejected the argument of the United States that the county officers had reasonably relied in good faith upon the warrants and that the evidence was therefore admissible on the authority of *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). He found that the affidavit supporting the search warrant for the truck was made with a reckless disregard for the truth and that *Leon*'s good faith exception was thus inapplicable. *See* App. at 140–41 (quoting *Leon,* 468 U.S. at 923, 104 S.Ct. at 3420). As to the search warrant for George's residence, the magistrate conceded that "George makes no persuasive argument that there was any false statement in the affidavit for [that] search warrant." *Id.* at 141. Nevertheless, the magistrate stated that the county magistrate "was misled by the representation that both search warrants were being sought to obtain evidence as to the Rice case, when . . . the primary purpose was to seek incriminating evidence in the Gaudet case." *Id.* at 142.

The United States filed objections to the magistrate's proposed findings and recommendations. *See id.* at 146–60. The government objected to the magistrate's finding that the warrants were not supported by probable cause and that the challenged evidence was not admissible under the good faith exception to the exclusionary rule. It also raised for the first time two additional arguments in opposition to the suppression motions. First, the government argued that George "had no reasonable expectation of privacy" in his

truck tires and that he thus was not entitled to suppression of the tire treads. *Id.* at 157. Second, the government argued that the items on and in George's truck—specifically the tires and hacksaw blades—inevitably would have been discovered and therefore were admissible under the inevitable discovery exception to the exclusionary rule. *See id.* at 158–59. · The district court adopted the magistrate's proposed findings and recommendations "in totality," refusing to consider the government's privacy and inevitable discovery arguments because the government had not raised these arguments before the magistrate. *Id.* at 167. The court subsequently denied the government's motion to reconsider, reemphasizing its unwillingness to entertain the "untimely" privacy and inevitable discovery arguments. *See id.* at 177–81.

The United States appeals the district court's grant of George's suppression motion. *See* 18 U.S.C. § 3731.

## II.

The United States first contends that the district court violated the Federal Magistrates Act, 28 U.S.C. §§ 631–639, by refusing to consider the government's arguments that the tires and the hacksaw blades were admissible because George had no cognizable privacy interest in his tires and because the hacksaw blades inevitably would have been discovered.[3] As noted, although the government presented these arguments in its objections to the magistrate's findings and recommendations, the district court refused to consider either argument because the government had not presented them before the magistrate:

> The Government's objections concerning "expectation of privacy" and "inevitable discovery" raise issues of law· and fact which were not presented in its written response to the motions to suppress or at the suppression hearing. The Court has previously advised the Government that attempts to introduce additional evidence or raise new arguments subsequent to an adverse ruling by the Magistrate will not be permitted by the Court. . . .

App. at 167.

The Federal Magistrates Act permits a district court judge to refer a pretrial suppression motion to a magistrate for the conduct of hearings, including evidentiary hearings. *See* 28 U.S.C. § 636(b)(1)(B).[4] Upon the completion of hearings, the magistrate submits proposed findings of fact and recommendations to the court, which "shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." *Id.* § 636(b)(1); *see Wimmer v. Cook,* 774 F.2d 68, 75 (4th Cir.1985) (noting that "the precise language of" section 636(b) gives a litigant "the right, upon objection, to a *de novo* [judicial] determination on the findings made by the magistrate").[5] After conduct-

---

**3.** The tires and the hacksaw blades were recovered during the execution of the search warrant issued for George's truck. The district court found that the affidavit and complaint in support of this warrant failed to establish probable cause, *see* App. at 138–39, 164–66, and the government does not contest this finding. The district court also declined to apply *Leon*'s good faith exception so as to permit admission of the evidence recovered pursuant to this warrant. *See id.* at 140–41, 166. In light of our disposition of the government's appeal with respect to the tires and the hacksaw blades, *see* parts II.–IV., *infra,* we need not and do not address these aspects of the district court's order.

**4.** A "judge may ... designate a magistrate to conduct hearings, including evidentiary hearings, and to submit to a judge of the court proposed findings of fact and recommendations for the disposition, by a judge of the court," of a

motion to suppress evidence in a criminal case. *Id.*

**5.** The Federal ·Magistrates Act as originally enacted did not specify by terms that the district court must review *de novo* the magistrate's findings and recommendations. *See generally Wimmer,* 774 F.2d at 70–72; *Campbell v. United States Dist. Court,* 501 F.2d 196, 201–07 (9th Cir.), *cert. denied,* 419 U.S. 879, 95 S.Ct. 143, 42 L.Ed.2d 119 (1974). In 1976, Congress added this explicit requirement by amendment to section 636(b)(1). *See* Pub.L. No. 94–577, § 1, 90 Stat. 2729 (1976); H.R.Rep. No. 1609, 94th Cong., 2d Sess. 3 (1976) ("[T]he district judge in making the ultimate determination of the matter, would have to give fresh consideration to those issues to which specific objection has been made by a party."), *reprinted in* 1976 U.S.Code Cong. & Admin.News 6162, 6163, *and quoted in*

ing *de novo* review, a "judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate. The judge may also receive further evidence or recommit the matter to the magistrate with instructions." 28 U.S.C. § 636(b)(1). *See generally Camby v. Davis,* 718 F.2d 198, 199–200 (4th Cir.1983).

 We believe that as part of its obligation to determine *de novo* any issue to which proper objection is made, a district court is required to consider all arguments directed to that issue, regardless of whether they were raised before the magistrate.[6] By definition, *de novo* review entails consideration of an issue as if it had not been decided previously. It follows, therefore, that the party entitled to *de novo* review must be permitted to raise before the court any argument as to that issue that it could have raised before the magistrate. The district court cannot artificially limit the scope of its review by resort to ordinary prudential rules, such as waiver, provided that proper objection to the magistrate's proposed finding or conclusion has been made and the appellant's right to *de novo* review by the district court thereby established.[7] Not only is this so as a matter of statutory construction; any other conclusion would render the district court's ultimate decision at least vulnerable to constitutional challenge. *See United States v. Raddatz,* 447 U.S. 667, 683, 100 S.Ct. 2406, 2416, 65 L.Ed.2d 424 (1980) (holding that "delegation" to a magistrate "does not vio-

late Art. III *so long as the ultimate decision is made by the district court"* (emphasis added)); *cf. United States v. Shami,* 754 F.2d 670, 672 (6th Cir.1985) (*"[D]e novo* review of a magistrate's report is both statutorily and constitutionally required."); *United States v. Elsoffer,* 644 F.2d 357, 359 (5th Cir.1981) ("The authority to grant or deny a motion to suppress must be retained by a judge appointed pursuant to Article III of the Constitution.").

Accordingly, it was incumbent upon the district court to consider the arguments by the United States that George had no cognizable privacy interest in the tires of his truck and that the hacksaw blades inevitably would have been discovered. *See Shami,* 754 F.2d at 672; *cf. Gioiosa v. United States,* 684 F.2d 176, 178–79 (1st Cir.1982) (holding that a district court's review of a magistrate's report and recommendation only for clear error does not satisfy the requirement of *de novo* review). Because the government's arguments were properly before the district court and because they present questions of law or undisputed fact, we treat them as properly before us on appeal, *see United States v. Lewis,* 621 F.2d 1382, 1387 (5th Cir.1980), *cert. denied,* 450 U.S. 935, 101 S.Ct. 1400, 67 L.Ed.2d 370 (1981), and turn to consideration of their merits.

### III.

 The United States argues that the "district court plainly erred in suppressing the truck tires" because George does not

---

*United States v. Raddatz,* 447 U.S. 667, 675, 100 S.Ct. 2406, 2412, 65 L.Ed.2d 424 (1980).

**6.** A motion to suppress decided by a magistrate is not one of the pretrial matters that may be reviewed by the district court merely for clear error or plain error. *See id.* § 636(b)(1)(A). Congress' failure to prescribe a "clearly erroneous" standard of review for suppression motions reinforces the need for the district court to conduct plenary, *de novo* review of such matters. *Cf. Thomas v. Arn,* 474 U.S. 140, 149–50, 106 S.Ct. 466, 471–72, 88 L.Ed.2d 435 (1985) (contrasting the existence of a "clearly erroneous" standard of review under section 636(b)(1)(A) with its absence elsewhere); *Park Motor Mart, Inc. v. Ford Motor Co.,* 616 F.2d 603, 605 (1st Cir.1980) (same).

**7.** A party waives the right to appellate review of a magistrate's decision if it fails to object to the proposed decision before the district court. *See United States v. Schronce,* 727 F.2d 91, 94 (4th Cir.), *cert. denied,* 467 U.S. 1208, 104 S.Ct. 2395, 81 L.Ed.2d 352 (1984); *see also Thomas,* 474 U.S. at 155, 106 S.Ct. at 474 (holding that "a court of appeals may adopt a rule conditioning appeal, when taken from a district court judgment that adopts a magistrate's recommendation, upon the filing of objections with the district court"); *cf. Wright v. Collins,* 766 F.2d 841, 846–47 & n. 3 (4th Cir.1985) (holding that a *pro se* litigant does not lose the right to appeal upon failing to object to a magistrate's report absent "fair notification of the consequences of failure to object").

have an objectively reasonable expectation of privacy in tires on a truck that he drives and parks in public places. Appellant's Br. at 32. We agree.

The Fourth Amendment protects only those "expectation[s] of privacy ... that society accepts as objectively reasonable," *California v. Greenwood,* 486 U.S. 35, 39, 108 S.Ct. 1625, 1628, 100 L.Ed.2d 30 (1988); *see also, e.g., Smith v. Maryland,* 442 U.S. 735, 740–41, 99 S.Ct. 2577, 2580, 61 L.Ed.2d 220 (1979); *Katz v. United States,* 389 U.S. 347, 360–61, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring), and generally, "[w]hat a person knowingly exposes to the public ... is not a subject of Fourth Amendment protection," *Katz,* 389 U.S. at 351, 88 S.Ct. at 511. The Supreme Court has repeatedly refused to recognize a legitimate Fourth Amendment privacy interest in those parts of an automobile's interior that are visible from outside. The Court held in *New York v. Class,* 475 U.S. 106, 114, 106 S.Ct. 960, 966, 89 L.Ed.2d 81 (1986), for example, that the visual examination (from outside the vehicle) of an identification number appearing on the vehicle's interior "does not constitute a [Fourth Amendment] 'search.'" *See also Texas v. Brown,* 460 U.S. 730, 740, 103 S.Ct. 1535, 1542, 75 L.Ed.2d 502 (1983) (plurality opinion) ("There is no legitimate expectation of privacy shielding that portion of the interior of an automobile which may be viewed from outside the vehicle by either inquisitive passersby or diligent police officers." (citations omitted)).

A majority of the Supreme Court has never held that there is no legitimate expectation of privacy in the exterior of a vehicle. A plurality of the Court in *Cardwell v. Lewis,* 417 U.S. 583, 94 S.Ct. 2464, 41 L.Ed.2d 325 (1974), however, held that "examination of [a] tire ... and the taking of paint scrapings from the exterior of [a] vehicle" do not implicate any cognizable Fourth Amendment privacy interest. *Id.* at 591, 94 S.Ct. at 2469.[8] The plurality reasoned that there was no reasonable expectation of privacy in the exterior of an automobile because an automobile "seldom serves as one's residence or as the repository of personal effects. A car has little capacity for escaping public scrutiny. It travels public thoroughfares where both its occupants and its contents are in plain view." *Id.* at 590, 94 S.Ct. at 2469; *accord, e.g., South Dakota v. Opperman,* 428 U.S. 364, 368–69, 96 S.Ct. 3092, 3096–97, 49 L.Ed.2d 1000 (1976) (observing that automobiles "are subjected to pervasive and continuing governmental regulation and controls" because of the legitimate governmental interest in "public safety and the efficient movement of vehicular traffic"). Moreover, it is evident from the analysis—if not the holding—in *Class* that there can be no reasonable expectation of privacy in a vehicle's exterior. The five-member majority in *Class* expressly endorsed the *Cardwell* plurality's conclusion that an examination of the exterior of an automobile "does not constitute a [Fourth Amendment] 'search'" because the vehicle "is thrust into the public eye." *Class,* 475 U.S. at 114, 106 S.Ct. at 966 (citing *Cardwell,* 417 U.S. at 588–89, 94 S.Ct. at 2468).[9] And the rationale for the holding in *Class* that the

---

**8.** Justice Powell did not reach the expectation of privacy question in *Cardwell.* He would have held that the Fourth Amendment claim was not reviewable on federal collateral review because the state prisoner had a full and fair opportunity to litigate that claim in state court. *See id.* at 596, 94 S.Ct. at 2472 (Powell, J., concurring in the result); *cf. Stone v. Powell,* 428 U.S. 465, 489–95, 96 S.Ct. 3037, 3050–53, 49 L.Ed.2d 1067 (1976) (Powell, J.).

**9.** Justice Powell was a member of the five-Justice majority in *Class* that endorsed the plurality holding in *Cardwell* that there is no reasonable expectation of privacy in the exterior of an automobile. *See Class,* 475 U.S. at 107, 106 S.Ct. at 962; *see also id.* at 120, 106 S.Ct. at 969 (Powell, J., concurring) ("Unquestionably, [an] officer ... may look through the windshield, observe the [vehicle identification number], and record it without implicating *any* Fourth Amendment concerns." (emphasis added)). Justice White, who was a member of the *Cardwell* plurality, dissented in *Class. See id.* at 131, 106 S.Ct. at 975 (White, J., dissenting). By the time *Class* was decided, however, Justice O'Connor, who authored *Class,* had succeeded Justice Stewart, who was one of the *Cardwell* dissenters. *See Cardwell,* 417 U.S. at 596, 94 S.Ct. at 2472 (Stewart, J., dissenting). Therefore, at least five current and former Supreme Court Justices have embraced *Cardwell.*

visible interior of an automobile is not protected by the Fourth Amendment was that the visible interior is more analogous to the vehicle's exterior than to its "trunk or glove compartment." *Id.*

There is thus little question in the aftermath of *Cardwell* and *Class* that one does not have a reasonable expectation of privacy in the visible exterior parts of an automobile that travels the public roads and highways. If, as the Court held in *Class*, there is no privacy interest in the interior of an automobile visible from the outside,[10] *a fortiori*, as the *Cardwell* plurality recognized and the *Class* majority assumed, there can be no privacy interest in the visible exterior portions of an automobile.[11]

George was arrested while in his truck. As in *Cardwell*, George's truck "was seized from a public place where access was not meaningfully restricted." *Cardwell*, 417 U.S. at 593, 94 S.Ct. at 2471; *cf. United States v. Knotts*, 460 U.S. 276, 282,

103 S.Ct. 1081, 1085, 75 L.Ed.2d 55 (1983) (holding that no "expectation of privacy extended to the visual observation of [an] automobile arriving on [private] premises after leaving a public highway"). Having chosen to drive and park his truck in public, George had no "effective[ ]" way to "bar the public from viewing" the truck or its tires. *Oliver v. United States*, 466 U.S. 170, 179, 104 S.Ct. 1735, 1741, 80 L.Ed.2d 214 (1984); *see also Greenwood*, 486 U.S. at 40, 108 S.Ct. at 1628 ("It is common knowledge that [objects] on or at the side of a public street are readily accessible to animals, children, scavengers, snoops, and other members of the public." (footnotes omitted)). His tires were at all times exposed to public view, and "[a]ny member of the public" could "readily discern[ ]" the essential characteristics of the tires "in a physically nonintrusive manner." *California v. Ciraolo*, 476 U.S. 207, 213, 106 S.Ct. 1809, 1812, 90 L.Ed.2d 210 (1986). Under

**10.** Numerous decisions have affirmed this principle. *See, e.g., Brumfield v. Jones*, 849 F.2d 152, 155 (5th Cir.1988) (passenger visible through car window); *People v. Lindsey*, 182 Cal.App.3d 772, 778–79, 227 Cal.Rptr. 550, 553 (1986) (steering column); *People v. Romero*, 767 P.2d 1225, 1227 (Colo.1989); *State v. Billingsly*, 542 So.2d 444, 445 (Fla.Dist.Ct.App.1989); *Catchings v. State*, 256 Ga. 241, 347 S.E.2d 572, 578 (1986) (ashtray); *Shaw v. State*, 253 Ga. 382, 320 S.E.2d 371, 372 (1984) (dashboard), *cert. denied*, 469 U.S. 1212, 105 S.Ct. 1183, 84 L.Ed.2d 331 (1985); *State v. Cote*, 518 A.2d 454, 455–56 (Me.1986); *McDonald v. State*, 61 Md. App. 461, 487 A.2d 306, 311 (1985); *Commonwealth v. Sergeinko*, 399 Mass. 291, 503 N.E.2d 1282, 1285 (1987) (ashtray); *State v. Foley*, 218 N.J.Super. 210, 215–16, 527 A.2d 482, 484–85 (App.Div.1987); *People v. Manganaro*, 176 A.D.2d 354, 355, 574 N.Y.S.2d 587, 588–89 (1991), *appeal denied*, 79 N.Y.2d 860, 580 N.Y.S.2d 732, 588 N.E.2d 767 (1992); *Commonwealth v. Milyak*, 508 Pa. 2, 6–7, 493 A.2d 1346, 1348–49 (1985); *cf. United States v. Ramapuram*, 632 F.2d 1149, 1155–56 (4th Cir.1980) (declining to recognize a reasonable expectation of privacy in the contents of an unlocked trunk of an abandoned automobile), *cert. denied*, 450 U.S. 1030, 101 S.Ct. 1739, 68 L.Ed.2d 225 (1981).

**11.** *See, e.g., United States v. Muniz–Melchor*, 894 F.2d 1430, 1434–36 (5th Cir.) (external fuel tank), *cert. denied*, 495 U.S. 923, 110 S.Ct. 1957, 109 L.Ed.2d 319 (1990); *United States v. Hensel*, 699 F.2d 18, 32 (1st Cir.) (license plate), *cert. denied*, 461 U.S. 958, 103 S.Ct. 2431, 77 L.Ed.2d

1317, 464 U.S. 823, 104 S.Ct. 91, 78 L.Ed.2d 99, *and* 464 U.S. 824, 104 S.Ct. 94, 78 L.Ed.2d 100 (1983); *United States v. Michael*, 645 F.2d 252, 259–60 (5th Cir.) (*en banc*) (Clark, J., specially concurring) (beeper attached to vehicle exterior), *cert. denied*, 454 U.S. 950, 102 S.Ct. 489, 70 L.Ed.2d 257 (1981); *United States v. Humphries*, 636 F.2d 1172, 1178–79 (9th Cir.1980) (license plate number), *cert. denied*, 451 U.S. 988, 101 S.Ct. 2324, 68 L.Ed.2d 846 (1981); *Dorris v. State*, 656 P.2d 578, 582 (Alaska Ct.App.1982) (tires); *Tackett v. State*, 307 Ark. 520, 822 S.W.2d 834, 836 (1992) (paint scrapings and auto parts); *Watkins v. State*, 296 Ark. 345, 756 S.W.2d 907, 908 (1988) (license plate); *Deshazier v. State*, 155 Ga.App. 526, 271 S.E.2d 664, 667 (1980) (exterior photographs and paint scrapings); *State v. Skelton*, 247 Kan. 34, 795 P.2d 349, 358 (1990) (exterior soil and vegetation samples); *Department of Transp. v. Armacost*, 299 Md. 392, 474 A.2d 191, 198 (1984) (tailpipe exhaust gases); *Conner v. State*, 34 Md.App. 124, 366 A.2d 385, 387–89 (1976) (exterior serial number); *People v. Smith*, 162 Mich.App. 534, 413 N.W.2d 42, 44–45 (1987) (engine and transmission); *State v. Serna*, 290 N.W.2d 446, 447 (Minn.1980); *State v. Roy*, 265 N.W.2d 663, 665 (Minn.1978) (entire automobile); *State v. Ball*, 219 N.J.Super. 501, 505, 530 A.2d 833, 835 (App. Div.1987) (engine covered by only a blanket); *State v. Bolton*, 111 N.M. 28, 41–42, 801 P.2d 98, 111–12 (Ct.App.) (underside of truck), *cert. denied*, 111 N.M. 16, 801 P.2d 86 (1990); *Commonwealth v. Mangini*, 478 Pa. 147, 157, 386 A.2d 482, 487 (1978) (tires); *Hudson v. State*, 588 S.W.2d 348, 351–52 (Tex.Ct.Crim.App.1979) (exterior photograph).

such circumstances, as the *Cardwell* Court said of the tires and paint scrapings at issue in that case, "we fail to comprehend what expectation of privacy was infringed." 417 U.S. at 591, 94 S.Ct. at 2470. Because George lacked a reasonable expectation of privacy in his tires, he cannot object to introduction of the tires into evidence as violative of the Fourth Amendment. We therefore reverse the portion of the district court's order suppressing introduction of the tires into evidence.

## IV.

■ The United States next argues in reliance on *Nix v. Williams*, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984), that the hacksaw blades seized from George's truck "would inevitably have been discovered by lawful means" and therefore were admissible into evidence. Appellant's Br. at 34. In *Nix*, the Supreme Court held that fruits of an unconstitutional search should nevertheless be admitted if they inevitably would have been discovered by lawful means. *Accord United States v. Thomas*, 955 F.2d 207, 210–11 (4th Cir.1992); *United States v. Whitehorn*, 813 F.2d 646, 650 & n. 4 (4th Cir.1987), *cert. denied*, 487 U.S. 1234, 108 S.Ct. 2898, 101 L.Ed.2d 931 (1988). The government in effect argues that because there was probable cause to arrest George and because the hacksaw blades inevitably would have been discovered during the course of an inventory search following impoundment of his truck, the hacksaw blades are admissible notwithstanding any Fourth Amendment violation committed in acquiring them pursuant to a defective search warrant.

We agree for the reasons stated by the government that the inevitable discovery exception to the exclusionary rule is theoretically available to support admission of the hacksaw blades. County police had two lawful bases for arresting George. The police had secured a warrant for George's arrest, the validity of which

George does not challenge. In addition, as George himself appears to concede, the police had probable cause to arrest George within days after the Rice shooting, if not sooner. *See* Appellee's Br. at 19. The police could have arrested George in a public place based on this probable cause alone. *See United States v. Watson*, 423 U.S. 411, 417, 96 S.Ct. 820, 824, 46 L.Ed.2d 598 (1976); *United States v. McCraw*, 920 F.2d 224, 227 (4th Cir.1990). The police impounded George's truck after arresting him; impoundment of a suspect's vehicle after his arrest on a public highway is constitutionally reasonable. *See United States v. Duncan*, 763 F.2d 220, 224 (6th Cir.1985); *cf. Chambers v. Maroney*, 399 U.S. 42, 52, 90 S.Ct. 1975, 1981, 26 L.Ed.2d 419 (1970) ("For constitutional purposes, we see no difference between ... seizing and holding a car before presenting the probable cause issue to a magistrate and ... carrying out an immediate search without a warrant.").

Once the truck was lawfully in police custody, there were two ways in which the police lawfully could have found the hacksaw blades. First, they could have executed the search warrant for the truck, which they in fact did. Second, even in the absence of the search warrant, the police could have conducted a routine inventory search, during which the hacksaw blades might have been discovered. Thus, even if the search warrant was defective and *Leon*'s good faith exception inapplicable,[12] the inevitable discovery doctrine would permit the introduction of the hacksaw blades into evidence if the police would have found the blades pursuant to an inventory search of the lawfully impounded vehicle. *See Nix*, 467 U.S. at 447, 104 S.Ct. at 2510; *Whitehorn*, 813 F.2d at 650.

Although we accept the theory of the government's inevitable discovery argument, we are unprepared to reverse outright the portion of the district court's suppression order relating to the hacksaw blades because, as the United States con-

---

12. Because we instruct the district court on remand to conduct further proceedings on the inevitability of the discovery of the hacksaw blades, we do not address the government's al-

ternative argument that the district court erred in declining to admit the blades under *Leon*. *See also* note 3 *supra*.

cedes, *see* Appellant's Reply Br. at 8, there has been no opportunity to establish that the blades inevitably would have been discovered during the course of executing the county's standard inventory search. We therefore vacate the portion of the district court's suppression order relating to the hacksaw blades and remand the case for factfinding solely on the question of whether the hacksaw blades that were found in George's truck pursuant to the search warrant would have been discovered in any event pursuant to a standard inventory search by Upshur County police.[13] Because the hacksaw blades were located in a tool box inside the truck, the government must prove that under standard inventory procedures, the police would have opened the tool box in which the blades were in fact found. *See Florida v. Wells*, 495 U.S. 1, 4–5, 110 S.Ct. 1632, 1635–36, 109 L.Ed.2d 1 (1990); *Colorado v. Bertine*, 479 U.S. 367, 374 & n. 6, 107 S.Ct. 738, 742 & n. 6, 93 L.Ed.2d 739 (1987); *Opperman*, 428 U.S. at 374, 96 S.Ct. at 3099; *United States v. Kornegay*, 885 F.2d 713, 717 (10th Cir. 1989), *cert. denied*, 495 U.S. 935, 110 S.Ct. 2179, 109 L.Ed.2d 508 (1990); *cf. California v. Acevedo*, ── U.S. ──, ──, 111 S.Ct. 1982, 1991, 114 L.Ed.2d 619 (1991) (holding that police may conduct a warrantless search of both "an automobile and the containers within it where they have probable cause to believe contraband or evidence is contained").

## V.

 We address, finally, whether suppression of the boots recovered upon execution of the search warrant for George's residence is required.

After concluding that the residential warrant was not supported by probable cause, *see* App. at 139, the magistrate rejected the United States' argument that evidence recovered on the authority of this warrant should nonetheless be admitted under the good faith exception to the exclusionary rule recognized in *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). *See* App. at 141–43. In contrast to his findings as to the search warrant for George's truck, *see* note 3 *supra*, the magistrate found that "George [made] no persuasive argument that there was any false statement in the affidavit" supporting the warrant for the residence, App. at 141, such that the county magistrate who issued the warrant "was misled by information ... that the affiant knew was false or would have known was false except for his reckless disregard of the truth," *Leon*, 468 U.S. at 923, 104 S.Ct. at 3421 (citing *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978)); *see also* App. at 142 ("[T]here was no false statement ... in the affidavit for the search warrant for the house...." (magistrate's report)). Nevertheless, the magistrate refused to apply *Leon* on the ground that, in his view, the county police had "use[d] the Rice case as a subterfuge to search for items ... which might prove to be damning evidence in the Gaudet case." *Id.* In drawing the inference that the authorities had used the Rice investigation as a pretext to search for evidence relating to the Gaudet shooting, the magistrate relied primarily on the fact that the warrant was "obtained after only one full day into the investigation of the Gaudet shooting." *Id.* at 141.[14]

---

**13.** The United States represents that "Upshur County does have established written procedures that require an inventory of items in a seized vehicle." Appellant's Reply Br. at 7. The district court on remand should take judicial notice of these published policies and procedures. *See* Fed.R.Evid. 201; *Newcomb v. Brennan*, 558 F.2d 825, 829 (7th Cir.), *cert. denied*, 434 U.S. 968, 98 S.Ct. 513, 54 L.Ed.2d 455 (1977).

**14.** The magistrate's conclusion was also based on his assumption that "the authorities had re-

covered most of what they believed to be the rifle used in 5285 28 7 [the Rice] shooting." *Id.; see also id.* at 166 n. 6. Even if it were true that the authorities had found most of the rifle, it would not follow that they would have had no reason to search George's residence. Such a search could have uncovered a myriad of evidence. For instance, the police could have found additional rifle parts or .30/30 shells, which would have further incriminated George in the Rice shooting.

Upon reviewing the United States' objection to this portion of the magistrate's report, the district court agreed with the magistrate that "the primary purpose" for obtaining the residence warrant "was to seek incriminating evidence in the ... Gaudet investigation" and that under such circumstances, "the good-faith exception to the exclusionary rule is not available." *Id.* at 167.[15]

We believe that the magistrate and the district court erred in refusing to apply the good faith exception of *Leon* on the basis of their asserted belief that the police sought the residence warrant to acquire evidence in the Gaudet case rather than in the Rice case. Apart from the fact that the belief of the magistrate and the district court as to the motivations of the police who sought the warrant lacked reasonable foundation,[16] their inquiry into the subjective motivations of the officers was irrelevant to the applicability of *Leon.* The only relevant inquiry under *Leon* is whether it was "objectively reasonable" for the officers who executed the subsequently invalidated warrant to have relied upon the warrant. *Leon,* 468 U.S. at 922, 104 S.Ct. at 3420; *see also id.* at 919 n. 20, 104 S.Ct. at 3419 n. 20 ("We emphasize that the standard of reasonableness we adopt is an objective one."). The *Leon* Court expressly "eschew[ed] inquiries into the subjective beliefs of law enforcement officers who seize evidence pursuant to a subsequently invalidated warrant" and stated that such "expedition[s] into the minds of police officers would produce a grave and fruitless misallocation of judicial resources." *Id.* at 922 n. 23, 104 S.Ct. at 3420 n. 23; *see also Massachusetts v. Sheppard,* 468 U.S. 981, 988, 104 S.Ct. 3424, 3427, 82 L.Ed.2d 737 (1984) (inquiring into the "objective[ ] reasonable[ness]" of police conduct for purposes of applying *Leon* ). Recently, in extending *Leon*'s good faith exception to permit introduction of evidence obtained by police who acted in objectively reasonable reliance on a statute authorizing warrantless administrative searches, the Court reemphasized that "the standard ... is an objective one; the standard does not turn on the subjective good faith of individual officers." *Illinois v. Krull,* 480 U.S. 340, 355, 107 S.Ct. 1160, 1170, 94 L.Ed.2d 364 (1987) (citing *Leon,* 468 U.S. at 919 n. 20, 104 S.Ct. at 3419 n. 20). The district court therefore was foreclosed from inquiring into "the officer's actual state of mind at the time the challenged action was taken." *Maryland v. Macon,* 472 U.S. 463, 470–71, 105 S.Ct. 2778, 2783, 86 L.Ed.2d 370 (1985). Its role was limited to determining whether the officers who searched George's residence "acted in the objectively reasonable belief that their conduct did not violate the Fourth Amendment." *Leon,* 468 U.S. at

---

**15.** The district court also criticized the affidavit supporting the search warrant for the residence because "the affiant state[d] that he ha[d] personally observed rifles in the residence" but later "testified that he had seen *one* rifle in the residence five years earlier." *Id.* at 166. Although the court agreed with the magistrate that the affidavit included no "knowing and intentional misstatement[s]," the district court suggested that the affiant's reference to rifles evidenced "at least ... a reckless disregard for the whole truth which misled the issuing judicial officer." *Id.* Even if we assume that the district court's suggestion that the affiant had recklessly disregarded the truth was not clearly erroneous, it is apparent that this misstatement was immaterial. *Franks v. Delaware,* 438 U.S. 154, 156, 98 S.Ct. 2674, 2676, 57 L.Ed.2d 667 (1978) (defining a materially "false statement" in an affidavit as one that would be "necessary to the finding of probable cause"); *accord United States v. Colkley,* 899 F.2d 297, 301 (4th Cir.

1990); *see also United States v. Ventresca,* 380 U.S. 102, 108, 85 S.Ct. 741, 745, 13 L.Ed.2d 684 (1965) ("[A]ffidavits for search warrants ... must be tested and interpreted ... in a commonsense and realistic fashion. They are normally drafted by nonlawyers in the midst and haste of a criminal investigation. Technical requirements of elaborate specificity once exacted under common law pleadings have no proper place in this area.").

**16.** The magistrate and district court assumed that if the police were seeking evidence of the Gaudet shooting, they necessarily were not seeking evidence of the Rice shooting. In effect, the magistrate and district court ignored the fact that county police had reason to believe that George may have committed both crimes and thus that the police expected to find evidence in George's residence that would be relevant to both crimes.

918, 104 S.Ct. at 3418.[17]

When the inquiry is properly focused on the objective reasonableness of the officers' actions, it is evident that the officers did reasonably believe that their conduct was fully consistent with the Fourth Amendment. The police officers consulted with the county prosecutor as to whether to apply for the search warrant. After receiving his approval, they sought and received the warrant from a duly authorized judicial officer. The warrant was facially valid, and the magistrate found as a factual matter that the affidavit contained no false statement. *See* App. at 141–42; *cf. Sheppard,* 468 U.S. at 989–90, 104 S.Ct. at 3428 ("[W]e refuse to rule that an officer is required to disbelieve a judge who has just advised him ... that the warrant he possesses authorizes him to conduct the search he has requested."). Finally, the circumstances surrounding the application for the warrant confirm the reasonableness of the officers' belief that their conduct was lawful. George had been found in the immediate vicinity of the crime at or near the time of the Rice shooting. *See* App. at 200, 253–65. He spontaneously volunteered statements that betrayed his knowledge of the crime and at the same time gave the implausible explanation that he had been tracking a bear. *See id.* at 258–60, 276. It was known that a gunman had discarded near the crime scene sawed-off pieces of a gun that had been purchased by George. The evidence for which the officers wished to search (firearms, ammunition, hacksaws, clothing, footwear) was narrowly confined to items which they had reason—based upon their prior investigation—to believe were directly relevant to their ongoing investigation of the Rice shooting. And the search did not extend beyond that authorized.

We conclude as a matter of law, therefore, that the county police were objectively reasonable in their reliance on the search warrant pursuant to which they searched George's residence. There is no basis for believing that "a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." *Leon,* 468 U.S. at 922 n. 23, 104 S.Ct. at 3420 n. 23. *Leon* requires that evidence recovered under such circumstances be admissible into the prosecution's case-in-chief notwithstanding any Fourth Amendment defect in the warrant. Accordingly, we reverse the portion of the district court's order suppressing the boots found in George's residence during the search pursuant to the warrant issued by the Upshur County magistrate.

## CONCLUSION

For the reasons set forth above, the district court's order is reversed insofar as it directed suppression of the truck tires and boots seized from George's truck and residence, respectively, and it is vacated insofar as it ordered suppression of the hacksaw blades. The case is hereby remanded for further proceedings not inconsistent with this opinion.

17. The Court's reliance in *Leon* upon an objective standard and its rejection of inquiries into the subjective states of mind of the individual officers is consistent with the Supreme Court's general Fourth Amendment jurisprudence of reliance upon "objective standards of conduct, rather than standards that depend upon the subjective state of mind of the officer." *Horton v. California,* 496 U.S. 128, 138, 110 S.Ct. 2301, 2308, 110 L.Ed.2d 112 (1990). *See generally United States v. Rusher,* 966 F.2d 868, 885–890 (4th Cir.1992) (Luttig, J., concurring in part, concurring in the judgment in part, and dissenting in part). The Court, for example, has repeatedly emphasized that "the fact that [an] officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, *viewed objectively,* justify that action." *Scott v. United States,* 436 U.S. 128, 138, 98 S.Ct. 1717, 1723, 56 L.Ed.2d 168 (1978) (emphasis added); *id.* at 136, 98 S.Ct. at 1722 ("[T]he existence *vel non* of [a Fourth Amendment] violation turns on an objective assessment of the officer's actions...."); *accord, e.g., Macon,* 472 U.S. at 470, 105 S.Ct. at 2782; *United States v. Villamonte-Marquez,* 462 U.S. 579, 584 n. 3, 103 S.Ct. 2573, 2577 n. 3, 77 L.Ed.2d 22 (1983); *cf. Graham v. Connor,* 490 U.S. 386, 397, 109 S.Ct. 1865, 1872, 104 L.Ed.2d 443 (1989) ("An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force....").

REVERSED IN PART, VACATED IN PART, AND REMANDED