Present:  All the Justices

LANSDOWNE DEVELOPMENT COMPANY, L.L.C.
                                        OPINION BY
v.  Record No. 981043      JUSTICE LAWRENCE L. KOONTZ, JR.
                                      February 26, 1999
XEROX REALTY CORPORATION, ET AL.


            FROM THE CIRCUIT COURT OF LOUDOUN COUNTY
                     Thomas D. Horne, Judge

     In this appeal, we consider whether the contract between

the parties to a real estate transaction required the purchaser

to provide a deed of trust to the seller to secure the

purchaser's performance of rezoning proffers made by the seller

to the local government, where the contract required the

purchaser to assume the seller's liability for the proffers.

                            BACKGROUND

     Although the record in this complex land development case

is quite extensive, we recount only those facts relevant to our

resolution of the appeal.  Xerox Realty Corporation (Xerox

Realty), a wholly owned subsidiary of Xerox Corporation, is the

owner of approximately 1,350 acres of undeveloped land in

Loudoun County (the property).  Xerox Realty also owns an

adjacent developed parcel leased to another Xerox subsidiary,

the Xerox Document University (the XDU parcel).  Xerox Realty

had planned to use the undeveloped property for expansion and

mixed commercial and residential development.  However, due to

changes in market conditions, Xerox Realty determined that

commercial development of the property was not feasible and began exploring the possibility of selling the property to a developer for use exclusively as a residential development. This change in the development concept required rezoning of the property.

At the time the decision to change the development concept was made, Xerox Realty had already made various proffers to Loudoun County concerning the development of the property and had entered into contracts and conservancy documents relevant to the use of both the property and the XDU parcel. In the summer of 1993, Xerox Realty entered into negotiations with Lansdowne Development Company, L.L.C. (Lansdowne)[1] for the sale of the property. The completion of the sale was conditioned upon the successful rezoning of the property for residential development, and Xerox Realty was to "take the lead on the rezoning effort with the cooperation and input of [Lansdowne]." During the negotiations and in the final contract, the parties referred to the development plan for the property, including the existing and anticipated proffer obligations, as "the Project."

During the negotiations between Xerox Realty and Lansdowne, Xerox Realty estimated the total value of the project prior to

_____

[1]Xerox Realty initially negotiated with Parity Partners, a California partnership controlled by Lansdowne's principal.

2

development at 40 million dollars, of which approximately 18.5 million dollars represented Xerox Realty's obligation to complete the proffers it had previously made or would make to secure the necessary rezoning.  In a letter of intent dated September 30, 1993, Lansdowne agreed to a cash purchase price of 21.5 million dollars and the assumption "of [Xerox Realty's] liabilities and obligations with respect to the Project (including, without limitation, those arising under contracts, proffers, bonds, conservancy documents and other matters related to the [property]) and [to] secure a release of [Xerox Realty] therefrom, if possible."  Lansdowne's letter of intent further specified that Lansdowne's "agreement to perform such proffer obligations will be secured by [a] Deed of Trust . . . and by a reserve account."

In the final contract, dated December 30, 1993, between Xerox Realty and Lansdowne, these aspects of the negotiations regarding the purchase price of the property and the assumption of liability for the rezoning proffers were memorialized in the following terms:

> Purchaser shall assume the Liabilities and, to the extent Seller has not been released from the Liabilities, shall pay, honor and discharge such Liabilities when due and payable or otherwise required to be performed under the relevant agreements and instruments. . . .
>
> [A]t Closing Purchaser shall assume all proffer obligations with respect to the Project provided for

3

in the Development Concept Plan . . . ("Proffer Obligations").  All such Proffer Obligations shall be performed by Purchaser as and when required under the Development Concept Plan.  Proffer Obligations that require expenditures of sums of money in connection with their performance . . . are referred to herein as "Monetary Proffers."  Purchaser's obligations hereunder to perform the Monetary Proffers shall be secured by the Purchase Money Trust (as hereinafter defined).  The amount to be secured shall be determined prior to Closing by christopher consultants or by another engineer mutually acceptable to the parties. . . .

If Purchaser fails to timely perform its Proffer Obligations . . . and if Loudoun County requires Seller to perform such Proffer Obligations or if the failure to perform such Proffer Obligations has a material adverse effect on the use and operation of the XDU Parcel, . . . then Seller shall have the right, but not the obligation . . . to enter upon the Land . . . to perform such unperformed Proffer Obligations as may be deemed necessary by Seller in its sole discretion.

The Purchase Money Trust as defined in the contract included a purchase money note "secured by a first lien deed of trust . . . on the Project."  Relevant to this appeal, the contract also provided that in the event of litigation arising from the contract, "any judgment awarded to the prevailing party shall include all litigation expenses, including actual attorney's fees, which shall not be unreasonable, and court costs."

In order to obtain the rezoning required by the contract, Xerox Realty as owner of the property and the XDU parcel, along with other adjoining landowners and Lansdowne, made further

4

rezoning proffers to Loudoun County in an amendment to the original development plan dated May 24, 1995.  Loudoun County accepted the amended development plan, which required the parties to put into effect certain escrow arrangements and trust funds to assure adequate funding of construction and improvements related to the proffers.

Pursuant to the terms of the contract, christopher consultants[2] was to develop "an estimate for the proffer commitments made with the recently approved Rezoning and Concept Plan Amendment for Lansdowne."  On September 7, 1995, christopher consultants provided Xerox Realty with a preliminary estimate of the construction cost of the proffers, placing that cost in excess of 18 million dollars.  Xerox Realty forwarded this estimate to Lansdowne on September 26, 1995, indicating that Xerox Realty intended to use the estimate "in computing the final amount of the [Lansdowne] Deed of Trust" at the closing.

Prior to closing, Lansdowne arranged to sell two sections of the property.  Lansdowne requested that Xerox Realty release these sections from the deed of trust at closing.  Xerox Realty refused this request, noting that the contract had specific terms for release of portions of the property, and that these requirements would not be met under Lansdowne's proposal.

---

[2]The firm uses all lower case letters for its trade name.

5

After first obtaining an attorney's opinion letter indicating that Xerox Realty could not "be required to perform obligations under the Monetary Proffers," Lansdowne prepared a memorandum for christopher consultants requesting that it "determine the amount of security [Lansdowne] is to give in order to protect [Xerox Realty] from liability under the Monetary Proffers." In this memorandum, Lansdowne further stated that "[t]he amount of security to be granted by [Lansdowne] is to be distinguished from the projected cost of construction or comp[l]etion of the Monetary Proffers, which the [contract] does not request."

On January 22, 1996, Dr. Henry Grausz, Lansdowne's principal, met with Louis Canonico, a vice president of christopher consultants, and gave him the memorandum requesting an opinion as to the liability to be secured. Canonico told Grausz that, as an engineering firm, christopher consultants was not qualified to give an opinion as to liability.

On January 25, 1996, Canonico prepared a letter for Lansdowne stating that, while christopher consultants "cannot speak to legal issues relating to proffers or sales contracts," it had "retained the services" of the attorney who had provided Lansdowne with the opinion letter. Relying on the attorney's opinion that Xerox Realty would have no liability to perform the proffers after the sale of the property, the letter goes on to

6

state that "we find that there is zero dollars liability, in terms of the value of what would need to be secured relating to [M]onetary [P]roffers as it impacts the seller of the Lansdowne project." At trial, Canonico admitted that christopher consultants had not retained the services of the attorney, and that he had relied on the opinion letter obtained by Lansdowne in drafting the January 25, 1996 letter. He further testified that in writing the letter, christopher consultants was not "taking any position as to what the contract [between Xerox Realty and Lansdowne] required" christopher consultants to perform. Lansdowne did not provide Xerox Realty with a copy of this letter.

On the day of the scheduled closing, Lansdowne refused to provide Xerox Realty with the deed of trust called for in the contract. Based on this refusal, Xerox Realty terminated the contract.

On March 27, 1996, Lansdowne filed a bill of complaint against Xerox Realty seeking specific performance of the contract. Lansdowne alleged that the contract required it to secure by deed of trust Xerox Realty's post-transfer liability for the "Monetary Proffers," not the actual cost of completing those proffers. Lansdowne further alleged that christopher consultants was to determine the amount of liability, if any, to be secured. Asserting that the January 25, 1996 letter from

7

christopher consultants established that Xerox Realty's post-transfer liability was "'zero dollars,'" Lansdowne alleged that it was entitled to specific performance of the contract without having to provide Xerox Realty with the deed of trust.[3] In its answer, Xerox Realty denied that a plain reading of the contract would support Lansdowne's interpretation that only Xerox Realty's liability was to be secured by the deed of trust. Xerox Realty also sought an award of attorney's fees and costs for having to defend the suit.

A hearing was held before the chancellor in which evidence in accord with the above recounted facts was received. In an opinion letter dated April 22, 1997, the chancellor indicated that he would rule in favor of Xerox Realty, stating:

> [T]he Court can find no justification to vary the express terms of the contract of sale. That agreement requires that Lansdowne Development Corporation . . . secure the monetary proffer obligations to be performed in connection with the development of the property with a purchase money trust securing completion of over eighteen million dollars in proffers as determined by the engineering firm agreed upon by the parties. The lengthy record is devoid of evidence that it was the understanding of the parties to leave open for further consideration the legal determination as to whether, and to what extent, [Xerox Realty] would have a continuing obligation to perform the proffers after the land had been conveyed. Lansdowne failed to tender such a deed of trust and was in default of its obligation to settle in

---

[3]Lansdowne also sought monetary damages under various theories. These claims are not at issue in this appeal.

8

accordance with the terms of the contract. . . . It is not for this court to rewrite the contract for the parties.

In a decree referencing his opinion letter, the chancellor awarded judgment to Xerox Realty and appointed a commissioner in chancery to determine "attorney's fees and costs to which [Xerox Realty] is entitled pursuant to [the contract]." After receiving expert testimony and reviewing the claims made by Xerox Realty, the commissioner deleted certain specific claims, reduced certain other claims by ten percent, and recommended an award of $908,007.73 for attorney's fees and $234,100.32 for other litigation expenses to Xerox Realty.

Prior to the commissioner's hearing, Lansdowne filed numerous pleadings objecting to Xerox Realty's claims for attorney's fees and costs. Subsequent to the filing of the commissioner's report, Lansdowne filed its exceptions to the report, incorporating its prior objections. Relevant to this appeal, Lansdowne asserted that Xerox Realty had not incurred any "litigation expenses" since all of the attorney's fees and costs had been billed to and paid by Xerox Realty's parent corporation. Lansdowne further asserted generally that the attorney's fees and costs claimed by Xerox Realty were unreasonable, contending that the case "could have been handled at typical Loudoun County rates."

In an opinion letter dated January 29, 1998, the chancellor found that Xerox Realty as "a wholly owned subsidiary of the Xerox Corporation, and not its parent company, was liable for, and ultimately held accountable for the legal services rendered in connection with this case." The chancellor further found that the fee schedules of the individual attorneys were reasonable and that "given the limited number of large law firms in Loudoun County and the relationship which [Xerox Realty] previously enjoyed with [a Washington, D.C.-based law firm], it was not unreasonable that Xerox would seek the services of that firm," when a local firm was required to withdraw from representation. Accordingly, the chancellor rejected Lansdowne's exceptions to the commissioner's report and awarded attorney's fees and costs to Xerox Realty in the amount determined by the commissioner. This appeal followed.

## DISCUSSION

Several familiar principles govern our resolution of this appeal. First, when contract terms are clear and unambiguous, we must construe those terms according to their plain meaning. Bridgestone/Firestone v. Prince William Square, 250 Va. 402, 407, 463 S.E.2d 661, 664 (1995). Additionally, we will not insert by construction, for the benefit of a party, a term not express in the contract. See id. Moreover, when considering the meaning of any part of a contract, we will construe the

10

contract as a whole.  See Vega v. Chattan Associates, 246 Va. 196, 199, 435 S.E.2d 142, 143 (1993).

Although the chancellor permitted the parties to present extensive parol evidence, his ultimate resolution rested on "the express terms of the contract of sale" and, thus, the chancellor implicitly found the contract to be clear and unambiguous. Moreover, neither party now contends that parol evidence is necessary to construe the contract in its favor.  Rather, Lansdowne contends that the plain meaning of the contract is that the Purchase Money Trust would secure Xerox Realty's post-sale liability[4] on the Monetary Proffers and that christopher consultants was to determine the amount of that liability. Xerox Realty contends that the plain meaning of the contract is that the Purchase Money Trust would secure Lansdowne's performance of the Monetary Proffers and that christopher consultants was to determine the cost of that performance.  We agree with Xerox Realty.

Under the terms of the contract, Lansdowne was to assume all liabilities relevant to the development and rezoning proffers made by Xerox Realty including the "Monetary Proffers."

---

[4]Although a local zoning administrator may bring a legal action to enforce zoning conditions, see Code § 15.2-2299, we need not, and do not, express an opinion on the applicability of this statute to Xerox Realty's post-sale liability on the Monetary Proffers in this case.

The contract plainly states that Lansdowne's "obligations . . . to perform the Monetary Proffers shall be secured by the Purchase Money Trust." (Emphasis added.)  Nothing in this language, or in any other provision of the contract, suggests that the parties intended the Purchase Money Trust to secure Xerox Realty's post-sale liability, and we will not insert such language for the benefit of Lansdowne.  Bridgestone/Firestone, supra.

Lansdowne further contends that regardless of the purpose of the security to be provided for the Monetary Proffers, the determination by christopher consultants in the January 25, 1996 letter that there was "zero dollars . . . to be secured relating to the [M]onetary [P]roffers" was binding on Xerox Realty since the parties agreed that christopher consultants would determine "[t]he amount to be secured."  We disagree with Lansdowne.

The January 25, 1996 letter Lansdowne procured from christopher consultants merely expresses an opinion as to Xerox Realty's post-sale liability.  Nothing in the contract suggests that the parties contemplated that christopher consultants, an engineering firm, would provide a legal opinion as to liability or that such an opinion was relevant to the determination of "[t]he amount to be secured" for Lansdowne's performance of the Monetary Proffers.  The September 7, 1995 letter provided by christopher consultants to Xerox Realty and sent by Xerox Realty

12

to Lansdowne established "[t]he amount to be secured," and, as Canonico's testimony confirms, nothing in the January 25, 1996 letter was intended to contradict or displace the estimate given in the earlier letter.

Lansdowne further contends that Xerox Realty should be estopped from asserting its right to have Lansdowne's performance of the Monetary Proffers secured by the deed of trust because of the terms of the amended development plan agreed to by Loudoun County, Xerox Realty, Lansdowne, and the other landowners. Lansdowne contends that the establishment of the escrow accounts and trust funds under the amended development plan eliminated any risk that the proffers would not be completed and, thus, that Xerox Realty, as a party to this agreement, waived its right to have completion of the proffers secured by the deed of trust.

Again, Lansdowne confuses the bargain of the contract, which required it to secure its performance of the Monetary Proffers, with the unrelated issue of whether Xerox Realty might ultimately incur liability as a result of Lansdowne's failure to perform. Under the contract, Lansdowne was obligated to perform the Monetary Proffers and was required to secure that obligation by providing Xerox Realty with a deed of trust. This obligation was part of the consideration Lansdowne was to give in return for the transfer of the property. It is simply not relevant

13

that Loudoun County, with Xerox Realty's agreement, obtained additional means to secure the ultimate completion of the proffers.

Finally, Lansdowne contends that the chancellor erred in awarding certain items as "litigation expenses" to Xerox Realty.[5] Citing Advanced Marine Enterprises v. PRC Inc., 256 Va. 106, 126, 501 S.E.2d 148, 160 (1998), Lansdowne contends that "library research, meals, courier services and the like" should not have been included in the award.

In Advanced Marine, we held that "a trial court's discretion to award costs under . . . the relevant provisions of Code §§ 14.1-177 through -201 [now § 17.1-600, et seq.], is limited only to those costs essential for prosecution of the suit, such as filing fees or charges for service of process," id., where the statute granting the trial court such authority limited the award to "costs of suit, including reasonable counsel fees." Code § 18.2-500. In doing so, we noted that the

---

[5]Lansdowne also reasserts its contentions that the litigation expenses were actually incurred by Xerox Realty's parent corporation and that the fee schedules of the attorneys were unreasonable. On appeal, the chancellor's decree approving a commissioner's report will be affirmed unless plainly wrong or without support in the evidence. Chesapeake Builders, Inc. v. Lee, 254 Va. 294, 299, 492 S.E.2d 141, 144 (1997). The record here adequately supports the reasonableness of the attorney's fees recommended by the commissioner and the chancellor's determination that Xerox Reality was ultimately liable for these fees and the other litigation expenses incurred on its behalf.

authority for such awards is in derogation of the common law and, thus, subject to a strict interpretation. Id. at 125, 501 S.E.2d at 159.

Here, the award of costs is not made pursuant to a statute, but under a provision of the contract permitting the prevailing party to recover "all litigation expenses, including actual attorney's fees, which shall not be unreasonable, and court costs." This language is more comprehensive than that of the statute at issue in Advanced Marine. Moreover, we are not required to apply the same narrow construction to a contract that we apply to a statute in derogation of the common law.

Nonetheless, we agree with Lansdowne that "all litigation expenses" cannot be so broadly construed as to include any charge made by an attorney to a client in the course of litigation. The record in this case shows that among other items, Xerox Realty's attorneys invoiced several "Conference Room Expenses" in amounts ranging from $1.50 to $11.00. During the commissioner's hearing, one of the attorneys indicated that this charge was for "sodas and coffee and things of that nature." Additional items found in the invoices submitted by Xerox Realty to the commissioner in chancery, apart from the actual legal work of the attorneys and their paraprofessional staff, include "Consulting Fees," "Office Supplies," "Local

15

Meals," "Local Transportation," "Binding," "Miscellaneous," and "Cash Expense."

Clearly, some of these charges are not direct costs of litigation and arguably should have been excluded from the award of costs recommended by the commissioner and approved by the chancellor. However, as presented to this Court, the record does not show that Lansdowne made an adequate, particularized objection to any of these charges during the commissioner's hearing or in its exceptions to the commissioner's report. Lansdowne's generalized exception to the "reasonableness" of the award of costs was insufficient to direct the chancellor, or this Court, to which of the myriad individual charges Lansdowne now objects. A principal function of a commissioner's hearing is to relieve the chancellor of the burden of assessing the minutiae of a complex evidentiary record. Thus, the commissioner's hearing was the proper forum in which to assert challenges to individual items or classes of items of the costs claimed as "litigation expenses," and it is not the duty of the chancellor, or of this Court, sua sponte to conduct a review of the record of the commissioner's hearing to determine the legitimacy of every individual item. Accordingly, we hold that Lansdowne failed to adequately preserve this issue for appeal. Rule 5:25.

16

## CONCLUSION

For these reasons, we find no reversible error in the judgment, and we will affirm the chancellor's decree denying Lansdowne specific performance of the contract and awarding litigation expenses to Xerox Realty.

<u>Affirmed</u>