**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 05-1398

ABOVENET COMMUNICATIONS, INCORPORATED,

Plaintiff - Appellee,

versus

1807 FARADAY COURT LIMITED PARTNERSHIP; TIGERS
XII CORPORATION,

Defendants - Appellants.

Appeal from the United States District Court for the Eastern
District of Virginia, at Alexandria.  Gerald Bruce Lee, District
Judge.  (CA-04-1514-1)

Argued:  November 29, 2005          Decided:  January 20, 2006

Before WILKINSON, MICHAEL, and MOTZ, Circuit Judges.

Affirmed by unpublished per curiam opinion.

**ARGUED:** David McCrory Estabrook, GORDON & ESTABROOK, R.L.L.P.,
Fairfax, Virginia, for Appellants.  Robert Richardson Vieth, COOLEY
& GODWARD, L.L.P., Reston, Virginia, for Appellee.  **ON BRIEF:**
Anthony A. Stenger, COOLEY & GODWARD, L.L.P., Reston, Virginia, for
Appellee.

Unpublished opinions are not binding precedent in this circuit.
See Local Rule 36(c).

PER CURIAM:

AboveNet Communications, Inc. entered a commercial lease agreement with 1807 Faraday Court Limited Partnership, allowing AboveNet to remove the mezzanine level of Faraday's commercial office building upon payment of a "Restoration Escrow." AboveNet paid the escrow and demolished the mezzanine. We must decide whether Faraday may retain the Restoration Escrow after AboveNet purchased the building outright. The lease specifically provided that Faraday "shall hold the Restoration Escrow . . . and shall use it to restore the Mezzanine to a condition similar to that in existence immediately prior to the Tenant Improvements." Because AboveNet's purchase of the building obviated the need for Faraday to perform any restorations of the mezzanine, the very purpose of the Restoration Escrow, we conclude that AboveNet is entitled to a return of the escrow payment. We therefore affirm the judgment of the district court.

I.

On June 15, 1999, AboveNet and Faraday executed a twenty-year lease for Faraday's multi-story commercial office building in Reston, Virginia. AboveNet intended to use the building as a data center, which required the installation of various generators and electronic devices. To accommodate this equipment, the lease specified that AboveNet would have the right to remove the

building's second floor mezzanine. The second floor comprised approximately 7600 of the 28,942 square feet of rentable office space in the building.

Eliminating the mezzanine reduced the amount of floor space that Faraday would have to rent to future tenants. The lease thus required AboveNet to provide a cash "Restoration Escrow" before proceeding with any demolition. Paragraph 11(b) of the lease, entitled "Tenant Alterations," governs the escrow payment. In relevant part it provides:

> Landlord shall hold the Restoration Escrow without interest payable to Tenant and shall use it to restore the Mezzanine to a condition similar to that in existence immediately prior to the Tenant Improvements, in addition to the other remedies available to Landlord. However, upon completion of the Tenant Improvements Landlord shall promptly return the Restoration Escrow to Tenant, in whole or in part, as follows: Landlord shall compare the quotient ("Improvement Percentage") of (I) the value of the improvements installed in the Building which, in Landlord's reasonable determination, shall have long term value to the Building, shall be useful to a successor tenant, and at Landlord's option shall remain in the Building at the end o [sic] the Term (the "Collateral Improvements"), divided by (ii) FOUR HUNDRED DOLLARS ($400.00), and also divided by the Removed Area; Landlord shall return to Tenant the Improvement Percentage (not to exceed 100%) of the Restoration Escrow.

AboveNet furnished a $761,500 Restoration Escrow pursuant to this provision.

AboveNet thereafter commenced work on the building. From October 1999 to March 2000, it removed the mezzanine and performed a variety of other renovations, which included installing new heating and cooling systems, replacing the roof, and redesigning

3

the building's interior, all at a total cost of approximately $12 million. When the renovations were complete, AboveNet requested an early return of the Restoration Escrow. Faraday refused, contending that AboveNet's improvements would not "have long term value to the Building" or be "useful to a successor tenant" within the meaning of Paragraph 11(b). AboveNet did not agree with Faraday's determination, but did not immediately contest it. AboveNet filed for bankruptcy in May 2002, but it continued to use the building as a data center and did not default on the lease.

The lease also gave AboveNet an option to purchase the building at a fixed price, approximately $6.5 million. On October 28, 2004, AboveNet exercised this purchase option and submitted to Faraday a purchase agreement and the required deposit. It again requested return of the Restoration Escrow. Faraday refused to relinquish the $761,500 escrow and indicated that it would not close on the sale of the building until AboveNet waived any rights to the escrow.

AboveNet filed a diversity suit in federal district court against Faraday and its general partner Tigers XII Corporation, seeking specific performance of the purchase option and return of the Restoration Escrow. The district court granted summary judgment to AboveNet on both grounds. Faraday thereafter conveyed the building to AboveNet, giving AboveNet a credit on the purchase price in the amount of the Restoration Escrow. Faraday now appeals

only the district court's decision ordering return of the Restoration Escrow.

## II.

The lease provides that Virginia law shall govern, and the parties agree that the $761,500 outlay was an escrow payment. In an escrow agreement, a grantor places money or property in trust to be transferred to a grantee only upon the satisfaction of specified contractual conditions. See Winslow, Inc. v. Scaife, 254 S.E.2d 58, 60 (Va. 1979) (per curiam). "An escrow arrangement, like all express trusts, is a contractual relationship, in which disbursement by the trustee is conditioned upon the happening of a specified occurrence." Old Republic Nat'l Title Ins. Co. v. Tyler (In re Dameron), 155 F.3d 718, 723 (4th Cir. 1998) (applying Virginia law). By the same token, when the conditions specified in the escrow arrangement are not met, the escrow must be returned to the grantor. As we held in Dameron, "[i]t is . . . elementary that when trust conditions are not satisfied the trustee has a duty to return the property to the trustor." Id.

In the lease before us, Paragraph 11(b) denominates the payment a "Restoration Escrow," and clearly provides that Faraday "shall hold the Restoration Escrow . . . and shall use it to restore the Mezzanine to a condition similar to that in existence immediately prior to the Tenant Improvements." Faraday's retention

5

of the escrow was therefore conditioned upon its need to rebuild the mezzanine level to recoup additional square footage for use by future tenants. AboveNet's decision to purchase the building eliminated any such need, and Faraday cannot now "use [the Restoration Escrow] to restore the Mezzanine," as the lease instructs. The conclusion inexorably follows that AboveNet is entitled to a return of the escrow. It is immaterial that Paragraph 11(b) does not specifically direct Faraday to return the escrow in the event that restoration is unnecessary, because restoration was the very condition on which Faraday's retention of the escrow was premised. See Dameron, 155 F.3d at 723 (holding that trustee had a duty to return the property to the grantor where applicable conditions were not met).

Faraday nonetheless argues that the purpose of the Restoration Escrow was to provide AboveNet with the right to destroy the mezzanine, and to protect Faraday in a transaction with a lessee of uncertain financial stability. We disagree. While Faraday is of course correct that the lease required AboveNet to provide a Restoration Escrow as a condition of demolishing the mezzanine, it does not follow that AboveNet's destruction of the mezzanine represented the condition for Faraday's retention of the escrow. Rather, as we discussed above, the plain language of Paragraph 11(b) unambiguously states that Faraday is to use the escrow to restore the mezzanine. As AboveNet's purchase prevented such

6

restoration from ever occurring, the escrow must be returned. See Dameron, 155 F.3d at 723.

Nor is it the case that the purpose of the escrow was to compensate Faraday for its risk in leasing the building to a potentially insolvent tenant, as the plain language of Paragraph 11(b) provides otherwise. The parties specifically fashioned this part of their agreement as a "Restoration Escrow" under the heading "Tenant Alterations," rather than as any kind of general payment for risk incurred. This is further borne out by the fact that the lease already required AboveNet to provide an additional $300,000 security deposit separate and distinct from the Restoration Escrow. Unlike the Restoration Escrow, the security deposit "shall be security for the performance by Tenant of all of Tenant's obligations, covenants, conditions and agreements under this Lease."

Faraday lastly maintains that Paragraph 11(b)'s provision for early return of the Restoration Escrow represents the exclusive situation under which Faraday must refund AboveNet. While the lease does specify that Faraday must relinquish the escrow if it determines that AboveNet has made "Collateral Improvements," as defined in the lease, the entire purpose of the escrow is that Faraday "shall use it to restore the Mezzanine." See Lansdowne Dev. Co. v. Xerox Realty Corp., 514 S.E.2d 157, 161 (Va. 1999) ("[W]hen considering the meaning of any part of a contract, we will

construe the contract as a whole."). Faraday's construction would all but eliminate Paragraph 11(b)'s express requirement that it use the escrow to rebuild the mezzanine. Moreover, when AboveNet exercised its purchase option, the price was fixed in the lease, and was therefore entirely unaffected by AboveNet's alterations to the building. Allowing Faraday to retain the $761,500 Restoration Escrow would amount to little more than a windfall gain.

## III.

For the foregoing reasons, the judgment of the district court is

AFFIRMED.