**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 21-2031**

———————

JTH TAX, LLC, f/k/a JTH Tax, Inc., d/b/a Liberty Tax Services; SIEMPRETAX+, LLC,

                Plaintiffs − Appellants,

        v.

BABLU SHAHABUDDIN,

                Defendant – Appellee.

———————

Appeal from the United States District Court for the Eastern District of Virginia, at Norfolk.  Rebecca Beach Smith, Senior District Judge.  (2:20−cv−00217−RBS−DEM)

———————

Argued:  December 8, 2022                          Decided:  April 19, 2023

———————

Before DIAZ and THACKER, Circuit Judges, and FLOYD, Senior Circuit Judge.

———————

Affirmed by unpublished opinion.  Judge Diaz wrote the opinion, in which Judge Thacker and Senior Judge Floyd joined.

———————

**ARGUED:**  Amy Mason Saharia, WILLIAMS & CONNOLLY LLP, Washington, D.C., for Appellants.  James Richard Harvey, III, WOODS ROGERS VANDEVENTER BLACK LLP, Norfolk, Virginia, for Appellee.  **ON BRIEF:**  Dustin M. Paul, Gaela R. Normile, VANDEVENTER BLACK LLP, Norfolk, Virginia, for Appellee.

———————

Unpublished opinions are not binding precedent in this circuit.

DIAZ, Circuit Judge:

This case began with the termination of the franchise relationship between Bablu Shahabuddin and his former franchisor, JTH Tax, Inc., d/b/a Liberty Tax Service, and SiempreTax+, LLC ("Liberty"). As is often the case with commercial disentanglements, there were loose ends, and each party now finds fault with the other's later actions.

Liberty claims Shahabuddin breached his contractual obligation to assign leases for certain properties where he had operated franchises. Shahabuddin claims Liberty shorted him on a revenue-sharing payment due under a later agreement. The district court granted summary judgment for Shahabuddin on both claims. We affirm.

I.

A.

Liberty offers tax-preparation services nationwide. Shahabuddin, Liberty's former franchisee, operated locations in New York, California, and Nevada before the parties terminated their franchise relationship in 2016.

To manage their corporate breakup, the parties entered into a Purchase and Sale Agreement ("PSA"). Shahabuddin agreed to sell Liberty the "assets, properties and rights" of his Liberty franchises and to assign certain commercial leases upon Liberty's request. J.A. 402, 405–07. The PSA specifically contemplated the assignment of eighteen properties in New York, listed in "Schedule C." J.A. 416. But it also allowed Liberty to seek assignment of other properties: Part 8(e) of the PSA stated that "to the extent any leases associated with [Shahabuddin's franchises] have not been assigned to [Liberty] and

2

[Liberty] requests such assignment, [Shahabuddin] agrees to assign such leases to [Liberty] immediately." J.A. 405–06.

The parties executed the PSA in June 2016, and their lawyers later exchanged several emails related to lease assignment. The PSA contemplated that the assignments would occur by the closing,[1] and the emails reflect that urgency. In the same message delivering the executed PSA to Shahabuddin, Liberty's counsel requested the "lease[]agreements for those locations listed in Schedule C" so their team could review and begin contacting landlords. J.A. 192. In another message, Liberty's counsel noted they were "working to get [the leases] assigned as quickly as possible," emphasizing that doing so was "in all of the parties' interest." J.A. 212.

Liberty, however, didn't want all the properties in Schedule C. Its counsel informed Shahabuddin's in mid-July that Liberty was "not taking" the leases for two such properties. J.A. 198. Shahabuddin's counsel pointedly responded: "Are these decisions final, and should [Shahabuddin] proceed to dispose of the leases?" J.A. 197. Liberty's counsel confirmed, "Yes, we are not moving forward with these," and directed Shahabuddin to transfer equipment and customer files from the two locations to Liberty. *Id.*

---

[1] The representations and warranties in the PSA were "deemed to have been given upon the execution of this Agreement and upon the Closing Date." J.A 406. Liberty sent Shahabuddin the fully executed agreement on July 1, 2016. And the PSA defined the "Closing Date" as Liberty's delivery to Shahabuddin "of an executed copy of this Agreement . . . and Assumption and Assignment forms and [Liberty's] acceptance in Virginia by [Liberty's] authorized officer." J.A. 404.

A month later, Shahabuddin's counsel wrote, "We understand that Liberty does not want any of the other properties that were not on Schedule C, and that [Shahabuddin] should dispose of them. Please let me know if there are any that [Liberty] is interested in getting assignments on." J.A. 202. Liberty's counsel replied, "I am not aware of any other leases Liberty wants to acquire, but will confirm with our leasing team." J.A. 212. Nothing in the record suggests Liberty followed up with any requests for non-Schedule C leases at that time.

Finally, in mid-November, Liberty reaffirmed that it would not take the lease for one of the properties it identified in July and informed Shahabuddin that it was also "not taking" the leases for two more properties on Schedule C. J.A. 213–14.

That appeared to conclude the assignment process, but it wasn't the end of the story.

### B.

Under the PSA, Liberty agreed to make annual payments to Shahabuddin at the end of fiscal years 2017, 2018, and 2019. Each annual payment would be 10 percent of "Net Revenue," defined as "gross fees received less all discounts, Cash-in-a-Flash, Send-a-Friend, and uncollected fees for the offices in the Territories." J.A. 402–03.[2] But when the time came to make the 2017 and 2018 payments, Liberty reneged.

---

[2] Cash-in-a-Flash and Send-a-Friend are incentive programs involving payments of $50 from the franchisee to the customer. Uncollected fees occur when a customer elects to pay for tax preparation services through a deduction from their refund, but the refund is then withheld by the IRS.

4

Shahabuddin sued and the parties resolved his claims via a 2018 Settlement Agreement. Liberty agreed to pay Shahabuddin $775,000 to satisfy the missed payments and reaffirmed its commitment to pay 10 percent of Net Revenue for 2019.[3] The parties also agreed that the Settlement Agreement generally "supersede[d] their prior agreements, negotiations or understandings," including the PSA. J.A. 420.

But certain provisions of the PSA survived "in full force," *id.*, and those provisions sent mixed signals about whether Shahabuddin's assignment obligations remained. On one hand, the Settlement Agreement preserved all of Section 8 of the PSA, which set out Shahabuddin's "Representations and Warranties." That included Subsection 8(e), which detailed Shahabuddin's promise to assign leases at Liberty's request alongside warranties that the leases were in full force and effect, clear of liens, and current on rent. But a standalone provision promising to assign the leases in Schedule C, Subsection 10(e), didn't survive.

C.

The renewed resolution was again short-lived. Before the 2019 payment, Liberty sent Shahabuddin a spreadsheet with Net Revenue calculations for the relevant locations. The spreadsheet contained a column for "Electronic Filing Fees," amounting to $430,332. J.A. 228. These fees were included in the spreadsheet's "Gross Fees" but were excluded from its "Net Revenue" figure. *Id.* Thus, the proposed final payment of $311,993 didn't include 10 percent of these fees.

---

[3] The new agreement defined Net Revenue by reference to the PSA.

5

Shahabuddin's counsel objected via email to the deduction of "new items not previously contemplated between the parties." J.A. 1059. Liberty's representative replied, explaining that three of the contested items—Cash-in-a-Flash, Send-a-Friend, and "Refunds"—had been deducted in prior years, and noting that the PSA provided for Cash-in-a-Flash and Send-a-Friend deductions. J.A. 1058. Liberty's response didn't address the deduction for Electronic Filing Fees. Even so, Shahabuddin's counsel provided wiring instructions "[b]ased on Liberty Tax's representation that its calculation of Net Revenue is in accordance with the agreement between the parties," and Liberty wired the funds. J.A. 1055–58.

Once again, though, that wasn't the end of the story.

### D.

In December 2019—five months after Liberty made the final Net Revenue payment and three years after the initial period of lease assignment—Liberty requested leases for five properties still held by Shahabuddin. Three were properties listed in Schedule C that Liberty said it was "not taking" in the 2016 emails. The remaining two weren't listed in Schedule C or mentioned in the emails.

Each of the five properties had been occupied in the interim by a new Liberty franchisee who subleased the properties from Shahabuddin. It was the end of this new franchise relationship that prompted Liberty to seek assignment of these properties in December 2019.

6

Shahabuddin refused to assign the leases, but he did enter temporary licensing agreements with Liberty, allowing Liberty to continue operating in the properties through the 2020 tax season. The licensing agreements were set to terminate on April 30, 2020.

E.

Before the licensing agreements terminated, Liberty sued Shahabuddin in the Southern District of New York, alleging breach of contract, unjust enrichment, and breach of the implied covenant of good faith and fair dealing. Liberty sought damages and specific performance of the PSA, including assignment of leases for the five properties. And it moved for a temporary restraining order and preliminary injunction preventing Shahabuddin from interfering with its ability to do business at the five properties when the licensing agreements expired.

After Shahabuddin invoked the forum-selection clauses in the PSA and Settlement Agreement, the district court transferred the case to the Eastern District of Virginia. Shahabuddin then filed an answer, a partial motion to dismiss, and counterclaims for tortious interference, defamation, and breach of contract (based on Liberty's exclusion of Electronic Filing Fees from the 2019 Net Revenue payment). After briefing, the district court dismissed Liberty's claim for unjust enrichment, denied its requests for injunctive relief, and dismissed Shahabuddin's counterclaims for tortious interference and defamation.

Both parties then moved for summary judgment on Liberty's remaining claims, and Shahabuddin moved for summary judgment on his breach-of-contract counterclaim.

The district judge referred all motions to a magistrate judge, who held a hearing and issued a Report and Recommendation. Shahabuddin argued Liberty hadn't established it requested assignment of the leases for the five properties in December 2019. But the magistrate judge determined that even if Liberty had requested the leases, it did so only after both expressly waiving its right to assignment and impliedly waiving that same right by waiting "an unreasonably long period" of time to make its request. *JTH Tax, LLC v. Shahabuddin*, No. 20-cv-217, 2021 WL 4352802, at *1 (E.D. Va. June 25, 2021), *report and recommendation adopted*, No. 20-cv-217, 2021 WL 3704726 (E.D. Va. Aug. 20, 2021).

The magistrate judge next determined that "under the plain language of the parties' agreements," Liberty had to pay Shahabuddin 10 percent of the 2019 Net Revenue, "including revenue received from Electronic Filing Fees." *Id.* It recommended granting Shahabuddin's motions for summary judgment on all claims and denying Liberty's.

Liberty objected, arguing the magistrate judge misapplied the summary judgment standards, wrongly concluded Liberty waived its right to assignment under the PSA, and erred in determining there weren't material issues of fact as to whether Shahabuddin had established his counterclaim for breach of contract. On the last point, Liberty raised—for the first time—the defense of accord and satisfaction.

The district judge adopted the magistrate judge's determination in full, adding two "observations." *JTH Tax*, 2021 WL 3704726, at *3. First, the court rejected Liberty's argument that Liberty couldn't have expressly waived its assignment right in the 2016 emails because the 2018 Settlement Agreement "restated" and "reinforced" Shahabuddin's

8

"promise to assign the leases upon request." J.A. 873–74. The court concluded that the Settlement Agreement didn't create a "new contractual right[]" to assignment, and that it didn't retroactively "shed light" on whether Liberty expressly waived its assignment rights in 2016. *JTH Tax*, 2021 WL 3704726, at \*3.

Second, the court rejected Liberty's contention that it could retract its prior waiver because Shahabuddin hadn't materially relied on it by the time Liberty requested assignment in 2019. It distinguished cases finding retraction of waiver in the context of ongoing obligations and the sale of goods, finding them inapplicable because the instant contract "contemplate[d] a discrete, one-time performance at a time close to [its] execution." *Id.* at \*3–4. The court didn't address Liberty's new defense of accord and satisfaction.

This appeal followed.

## II.

We review a district court's grant of summary judgment de novo. *Calloway v. Lokey*, 948 F.3d 194, 201 (4th Cir. 2020). We view the facts and draw all reasonable inferences in favor of the nonmoving party, Liberty.[4] *Ga. Pac. Consumer Prods., LP v. Von Drehle Corp.*, 618 F.3d 441, 445 (4th Cir. 2010).

---

[4] Liberty doesn't challenge the district court's denial of its motion for summary judgment.

9

Our role isn't to weigh the evidence or make credibility determinations, but to decide whether there is a genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 255 (1986); *PBM Prod., LLC v. Mead Johnson & Co.*, 639 F.3d 111, 119 (4th Cir. 2011). A fact is "material" if "proof of its existence or non-existence would affect disposition of the case." *Wai Man Tom v. Hosp. Ventures LLC*, 980 F.3d 1027, 1037 (4th Cir. 2020). And a dispute is "genuine" if "the evidence offered is such that a reasonable jury might return a verdict for the non-movant." *Id.* But a mere "scintilla of evidence" supporting the non-movant isn't sufficient to defeat a motion for summary judgment. *Anderson*, 477 U.S. at 252.

For Liberty's claims against Shahabuddin, the issues are whether Liberty waived its right to assignment before it requested the leases for the five properties in December 2019, and if so, whether it later retracted that waiver.[5] The issues as to Shahabuddin's counterclaim are whether he was entitled to a share of the Electronic Filing Fees and whether his claim is nonetheless barred by the defense of accord and satisfaction. We consider each in turn.

A.

We begin with Liberty's contention that the district court erred in holding Liberty waived its right to assignment.

---

[5] We don't consider Liberty's argument that the magistrate judge erred in holding no reasonable jury could find Liberty demanded assignment of the disputed leases. Neither the magistrate judge nor the district court relied on that conclusion—both instead held that Liberty waived its assignment right before making any demand.

Waiver is the voluntary, intentional abandonment of a known legal right. *Bergmueller v. Minnick*, 383 S.E.2d 722, 725 (Va. 1989).[6]  It has two essential elements: (1) knowledge of the facts basic to the exercise of the right, and (2) the intent to relinquish the right.  *Id.*  A waiver may be express, or it may be implied through "conduct, acts, or a course of dealing." *Woodmen of World Life Ins. Soc'y v. Grant*, 38 S.E.2d 450, 454 (Va. 1946).  The party relying on waiver has the burden to prove it by "clear, precise and unequivocal evidence." *Va. Polytechnic Inst. & State Univ. v. Interactive Return Serv., Inc.*, 595 S.E.2d 1, 6 (Va. 2004).

The district judge adopted and approved the magistrate judge's conclusion that "the undisputed facts" established waiver "as a matter of law" on two alternative grounds: (1) that Liberty expressly waived its right to assignment of the five disputed leases in the 2016 emails, and (2) that Liberty impliedly waived its right by "fail[ing] to request assignment of the leases until at least December of 2019." *JTH Tax*, 2021 WL 3704726, at \*2–3.  We agree on both points.  And we agree with the district court that retraction of waiver is inapplicable.

1.

First, we conclude Liberty expressly waived its right to assignment of the leases for the five properties.

---

[6] The parties agree Virginia law applies, consistent with the choice-of-law clauses in the PSA and Settlement Agreement.  *See* J.A. 411, 420.

Three of the five properties at issue were on Schedule C of the PSA. The magistrate judge found (and the district judge agreed) that Liberty expressly waived its right to assignment for these three properties "when [it] repeatedly told Shahabuddin that [it] would not be taking them and replied affirmatively that he was free to dispose of such leases." *JTH Tax*, 2021 WL 4352802, at *8.

For the remaining two properties, the magistrate judge pointed to Shahabuddin's counsel's August 2016 email which sought to confirm that Liberty didn't want any other properties that weren't on Schedule C, such that Shahabuddin could "dispose of them." *Id.* At the time, Liberty's counsel replied that they were "not aware of any other leases Liberty wants to acquire," but would confirm. J.A. 212. Despite continued communication with Shahabuddin about lease assignment over the following months, Liberty never followed up to request either property. The magistrate judge concluded that because Liberty "had already reiterated that Shahabuddin was free to dispose of leases [it chose] not to take," this correspondence established waiver as to the remaining two properties. *JTH Tax*, 2021 WL 4352802, at *8.

Liberty argues the 2016 emails only show that it didn't intend to take the leases for the five properties "at that time." Appellants' Br. at 23 (emphasis omitted). But that contention isn't supported by the record. In emails, Shahabuddin's counsel repeatedly asked whether he could "dispose of" the leases for properties Liberty wasn't taking, and Liberty said yes. *E.g.*, J.A. 197. Liberty's responses contradict an expectation that Shahabuddin would hold the properties in case Liberty wanted them later. And Liberty's counsel said it was in the parties' interests to get assignments finalized "as quickly as

12

possible"—a sentiment backed up by the flurry of emails in late 2016, followed by silence about assignment for the next three years.  J.A. 212.

Shahabuddin also submitted an affidavit from John Hewitt, Liberty's co-founder and former CEO, who executed the PSA on Liberty's behalf and had "personal knowledge of Liberty's decision to take assignment or decline to take assignment of the leases associated with the franchises in the PSA."  J.A. 193.  Hewitt stated that in 2016, Liberty determined that it didn't want the "ongoing financial liability associated with" leases for the five properties.  J.A. 194.  And he explained that "[o]nce [Liberty] decided not to request assignment of the leases . . . it did not expect [] Shahabuddin to keep them available for assignment indefinitely."  *Id.*

Hewitt also described the factors Liberty considered when determining whether to assume the leases of former franchisees: "the quality of the location, the recommendation of the leasing coordinator, relationship with the franchisee and the landlord, and whether assuming the lease payment obligations and liabilities made financial sense."  J.A. 193.  This description matches the email exchanges from 2016, where Liberty's counsel repeatedly referenced the leasing coordinator and requested Shahabuddin's help working through issues with landlords.

Finally, the PSA itself shows that assignment was to occur quickly.  The agreement specified that Liberty would reimburse Shahabuddin for May rent at assigned properties. That payment was to be made July 1, 2016, "contingent on delivery of executed assignment documents by [Shahabuddin] of the Business leases, as requested by [Liberty]."  J.A. 402–03.  Liberty also agreed to pay June rent for assigned properties directly to landlords.  And

13

the PSA stated that its "Closing Date" would occur when Shahabuddin had delivered, and Liberty had accepted, "an executed copy of this Agreement and all of the Assets via a Bill of Sale and Assumption and *Assignment* forms." J.A. 404 (emphasis added). That same provision gave Liberty the option to withdraw from the PSA if it wasn't executed by June 30, 2016.

Each of these terms suggests the parties contemplated finalizing assignment decisions within a few months. They don't support Liberty's post-hoc contention that when it said it was "not taking" the leases for the five properties in late 2016, it only meant it wasn't taking them "at that time." Appellants' Br. at 23.

In attempting to show a dispute of fact as to its intent to waive assignment in 2016, Liberty relies primarily on the 2018 Settlement Agreement. While that agreement generally superseded the PSA, it preserved Subsection 8(e), including Shahabuddin's obligation to assign "any leases associated with the Business" to Liberty upon its request. *See* J.A. 405–06, 420. According to Liberty, "The parties would have had no need to reaffirm that provision of the PSA if Liberty had already waived its [assignment] rights." Appellants' Br. at 24.

Shahabuddin counters that the parties kept 8(e) for its warranties that the "leases were valid, clear of liens, not in default," and paid up on rent. Appellee's Br. at 37; *see also* J.A. 405. And he points out that the Settlement Agreement "expressly superseded the most direct obligation in the PSA for Shahabuddin to assign leases to Liberty." Appellee's Br. at 37. That is, it didn't preserve Subsection 10(e), the standalone provision promising

14

to assign "the office real estate leases connected with the operation of the Business listed in Schedule C." *See* J.A. 407, 420.

The magistrate judge agreed with Shahabuddin that the Settlement Agreement didn't create a dispute of material fact as to express waiver. Likewise, the district judge found that Liberty's express waiver "was completed in 2016" and that "the Settlement Agreement, executed in 2018, does not shed light on whether" there was a waiver two years earlier. *JTH Tax*, 2021 WL 3704726, at *3.

We agree that Liberty expressly waived its assignment rights as a matter of law. The 2016 emails show that Liberty both had "knowledge of" its right to assignment of the five properties and "inten[ded] to relinquish" that right. *Bergmueller*, 383 S.E.2d at 725. Liberty's insistence otherwise is contradicted by its own statements at the time, the text of the PSA, and the uncontroverted affidavit from its then-CEO.[7] The district court thus correctly ruled that Liberty expressly waived its right to assignment of the five properties.

2.

If not "express," waiver may be "implied" through "conduct, acts, or a course of dealing." *Woodmen of World*, 38 S.E.2d at 454. If we had any doubt that Liberty expressly

---

[7] Liberty characterizes Hewitt as a disgruntled former CEO who was terminated by Liberty and now operates competing tax-preparation businesses at the five properties through a franchise relationship with Shahabuddin's sister-in-law. But Liberty offers no evidence to contradict Hewitt's affidavit on its terms. And even if Hewitt's current business position were enough to create a dispute about his credibility, we're satisfied that any such dispute wouldn't be material given the other evidence of Liberty's express waiver.

15

waived its assignment right in the 2016 emails, we would still affirm because Liberty impliedly waived its right by waiting more than three years to request assignment.

The closest issue as to express waiver concerns the two properties not on Schedule C. These properties were addressed in the August 2016 email exchange, when Shahabuddin's counsel directly asked whether he could "dispose of" the remaining properties not on Schedule C, and Liberty's counsel stated they were "not aware of any other leases Liberty wants to acquire, but will confirm with our leasing team." J.A. 212. Given that Liberty never followed up (at least before December 2019), we think this was likely an express waiver. But we address implied waiver for completeness.

The magistrate judge concluded, and the district judge agreed, that even if the 2016 emails didn't constitute an express waiver, Liberty "subsequently waived any right to the [five properties] by failing to request assignment of the leases . . . within a reasonable time." *JTH Tax*, 2021 WL 4352802, at *9. "When a contract is silent regarding the time of performance, the time of performance will be . . . a reasonable time after the execution of the agreement." *F.L. Hall, Inc. v. Warehouse Landing Assocs.*, 38 Va. Cir. 181, 1995 WL 17044498, at *2 (1995). And "[i]n determining what is a reasonable time, the circumstances to be considered . . . include the nature of the proposed contract, the purposes of the parties, the course of dealing between them, and any relevant usages of trade." *Id.* (cleaned up).

The PSA doesn't explicitly define the time for assignment, but as discussed above, all indications are that it was to occur within a matter of months. The purpose of the PSA was to transfer "assets, properties and rights used in connection with the Business" from

16

Shahabuddin to Liberty when their franchise relationship ended. J.A. 402. The parties agreed that Liberty had the right to determine which properties it was interested in and to demand assignment over the following months. But they didn't agree that Shahabuddin would hold the properties until such undefined future time as Liberty determined it was in its interest to take them.

The contours of the assignment right are clear from the PSA's terms, the 2016 emails, and the Hewitt affidavit. They're also apparent from Liberty's failure to request assignment for more than three years after signing the PSA.

Liberty argues that it didn't take assignment of the five properties because it was able to find a new franchisee, who sublet the locations from Shahabuddin and operated Liberty franchises from 2016 to 2019. But the fact that Liberty found another franchisee doesn't change that it didn't want to take financial responsibility for the properties in 2016. For example, during the 2016 email exchanges, two of the properties were identified as having "tax issues." J.A. 212. Liberty may have concluded those locations were more trouble than they were worth.

For three years, Liberty had the best of both worlds: It reaped the benefits of having a franchisee in the properties while avoiding any of the risk or costs involved in assignment. While Liberty's financial calculation may have changed when its new franchisee left in late 2019, by then it had waived its right to assignment.

The magistrate judge correctly recognized these dynamics, concluding that by the time Liberty requested assignment in 2019, Shahabuddin "would have needed to otherwise

dispose of the leases that [Liberty] w[as] not taking or risk financial loss by holding onto such leases indefinitely." *JTH Tax*, 2021 WL4352802, at *11.

The district judge agreed, and we do as well. And while the issue of what constitutes a reasonable time is usually for the jury, we agree that the three-year delay in this case was unreasonable as a matter of law. *See id.* at *9 (citing *Grossmann v. Saunders*, 376 S.E.2d 66, 70 (Va. 1989) and *Little v. Quin Rivers, Inc.*, No. 15-cv-20, 2015 WL 4363201, at *1 (E.D. Va. July 14, 2015)).

### 3.

Finally, we reject Liberty's contention that it retracted any waiver when it demanded assignment of the five properties in 2019.

Liberty admits that "Virginia case law does not address retraction of waiver" in this context. Appellants' Br. at 36. But, it argues, we must predict what the Supreme Court of Virginia would do if faced with this issue. Liberty points to the Restatement (Second) of Contracts, a treatise, and cases from other states to argue that "retraction of waiver is a common-law principle applied routinely across many jurisdictions." *Id.* at 39. It says there's no reason to think that Virginia's highest court wouldn't apply it here.

We disagree. To begin, we've already concluded that Liberty impliedly waived its assignment right when it failed to request assignment within a reasonable time. It wouldn't make sense if Liberty's implicit waiver could be retracted through the same (too late) request.

Beyond that, none of Liberty's sources persuade us that the Supreme Court of Virginia would apply retraction of waiver here.

18

Liberty relies heavily on *Municipal Authority of Westmoreland County v. CNX Gas Co.*, which involved an ongoing and continuous contractual relationship between a Pennsylvania municipality (the plaintiff) and those who had leased land from the county for oil and gas production (the defendants). 380 F. Supp. 3d 464, 466–67 (W.D. Pa. 2019). The lease agreement required the defendants to pay royalties, but permitted deduction of post-production costs, such as those required for processing, treatment, and transportation. *Id.* at 467. At first, however, the defendants paid royalties without deducting post-production costs. *Id.* at 467–68. When they later began deducting those costs, the plaintiff argued that the defendants had waived their contractual right to do so. *Id.* at 469.

The court rejected the plaintiff's argument. It determined that while the defendants had "impliedly waived their right to deduct post-production costs" when they didn't do so, that waiver wasn't "necessarily permanent." *Id.* at 470 (emphasis omitted). And it found retraction of waiver was permissible because the county hadn't established detrimental reliance; it was aware of and had budgeted for the later post-production deductions. *Id.* at 471.

We aren't persuaded by Liberty's reliance on *Westmoreland County*. To begin with, the case involves a Pennsylvania federal court applying Pennsylvania state law, which of course isn't binding on Virginia courts. Second, the court emphasized that retraction of waiver is "particularly applicable when the contract in question has a *recurring or periodic obligation*." *Id.* at 470 (emphasis added). But here, Shahabuddin had a one-time obligation to assign leases to Liberty at its request. Thus, even assuming the Supreme Court of

19

Virginia would apply *Westmoreland County*, there's no basis to think it would extend it to the facts here.

Liberty also cites *Bristol Metals, LLC v. Messer, LLC*, 498 F. Supp. 3d 840 (E.D. Va. 2020).  Like *Westmoreland County*, *Bristol Metals* involved a long-term commodities contract governed by Pennsylvania law.  *Id.* at 845.  At first, the plaintiff in *Bristol Metals* paid more than the contractual price cap, but like the defendants in *Westmoreland County*, it eventually sought to strictly enforce the contract's terms.  *Id.* at 845–46.  On those facts, the district court found the plaintiff successfully retracted its waiver.  *Id.* at 856–57.  But after briefing here concluded, we reversed the relevant portion of *Bristol Metals*, finding no valid contract existed at the time the district court found retraction of waiver.  *Bristol Metals, LLC v. Messer, LLC*, Nos. 21-1244, 21-1245, 2022 WL 17222216, at *5 (4th Cir. Nov. 23, 2022).  So *Bristol Metals* doesn't help Liberty.

We also agree with the district court that none of the cases Liberty cites involved a situation "where one party purports, years later, to retract its waiver of a right pursuant to a contractual provision that contemplates a discrete, one-time performance at a time close to the execution of the contract."  2021 WL 3704726, at *4.  The closest candidate, *Caro v. Hansen*, involved a one-time obligation to transfer a security interest.  875 P.2d 512, 513 (Or. Ct. App. 1994).  But that obligation wasn't conditional on the plaintiff's request, and the gap between the contract execution and the plaintiff's demand was less than one year.  *Id.* at 513–14.

While Liberty relies on cases from other jurisdictions, at least one decision from a Virginia trial court favors Shahabuddin.  In *F.L. Hall, Inc. v. Warehouse Landing*

20

*Associates*, the court considered a contract giving the plaintiff-buyers the option to demand a refund (plus interest) from the defendant-seller if the defendant didn't make agreed-upon improvements to several land parcels by a certain date. 38 Va. Cir. 181, 1995 WL 17044498, at *1 (1995). The improvements were completed 10 months late, but the plaintiffs didn't demand a refund for another 20 months, attempting to resell the properties in the meantime. *Id.* at *2.

Under those circumstances, the court held that the plaintiffs had waived their right to demand a refund. *Id.* at *3. It described the plaintiffs as having sat on their right for years while speculating in the real estate market, knowing they faced little risk as they were accruing interest on any eventual refund. *Id.* And it concluded that granting specific performance to the plaintiffs so long after their rights became active would be inequitable. *Id.*

The same is true here. Content to have its new franchisee operate with none of the risk associated with assignment, Liberty waited an unreasonable amount of time to request leases for the five properties. We don't think the Supreme Court of Virginia would reward Liberty by recognizing retraction of waiver and we won't do so here.

### B.

We next consider Liberty's contention that the district court erred in finding Shahabuddin is entitled to 10 percent of the Electronic Filing Fees for fiscal year 2019.

"Where the terms in a contract are clear and unambiguous, the contract is construed according to its plain meaning." *TM Delmarva Power, L.L.C. v. NCP of Va., L.L.C.*, 557 S.E.2d 199, 200 (Va. 2002). We must "not insert by construction, for the benefit of a party,

a term not express[ed] in the contract." *Lansdowne Dev. Co. v. Xerox Realty Corp.*, 514 S.E.2d 157, 161 (Va. 1999).

The district court correctly held that the definition of "Net Revenue" unambiguously included Electronic Filing Fees. In the 2018 Settlement Agreement, Liberty agreed to "make payment to Shahabuddin of 10% of the 2019 Net Revenue." J.A. 419. The Settlement Agreement used the PSA's definition of "Net Revenue"—"gross fees received less all discounts, Cash-in-a-Flash, Send-a-Friend, and uncollected fees for the offices in the Territories." J.A. 402, 418. It didn't allow for the deduction of Electronic Filing Fees.[8]

Liberty breached the Settlement Agreement when it did just that. The spreadsheet Liberty sent Shahabuddin before the 2019 payment included "Electronic Filing Fees" as part of the "Gross Fees" figure. J.A. 228. Liberty also admits the fees were "a revenue stream for Liberty Tax and its franchisees." J.A. 989. But when Liberty calculated final Net Revenue for 2019, it deducted the fees. *Id.*

To rule for Liberty, we would need to ignore the agreement's plain text. Liberty says that it could properly deduct Electronic Filing Fees from Net Revenue because the former didn't exist when the PSA was signed, and because the fees were generated by Liberty rather than its franchisees. But neither the PSA nor the Settlement Agreement specifies that fees collected by Liberty in the first instance are excluded, and neither excludes fees for new products.

---

[8] If there were any doubt, Liberty's Vice President of Treasury clarified in his deposition that Electronic Filing Fees are not "cash in a flash, send a friend or uncollected filing fees." J.A. 1001.

The parties' agreement is unambiguous, and we decline to modify it after the fact for Liberty's benefit.

Nor will we consider Liberty's argument that Shahabuddin's counterclaim is barred by the affirmative defense of accord and satisfaction. Liberty raised this defense for the first time in its objections to the magistrate judge's Report and Recommendation, and the district court judge had ample discretion not to consider it in that posture. *Samples v. Ballard* clarifies that a district court needn't consider new *issues* raised for the first time in objections, even if it must consider new *arguments* related to existing issues. *See* 860 F.3d 266, 271–273 (4th Cir. 2017) (discussing *United States v. George*, 971 F.2d 1113 (4th Cir. 1992)). *Samples* also clarifies that an "issue" corresponds to a "ground for relief," while an argument is a "position [] taken in support of or against" that ground. *Id.* at 273–74. We think an affirmative defense, like a "claim," is best characterized as an issue rather than an argument.

III.

In sum, Liberty waived its right to assignment of the five properties when it expressly declined to take the leases in 2016 and then waited three years to request assignment. Under the circumstances, retraction of waiver is inapplicable. Separately, the plain text of the parties' agreement didn't permit Liberty to deduct Electronic Filing Fees from the 2019 Net Revenue figure. The judgment of the district court is therefore

*AFFIRMED.*

23